## Michael Melford v. S. V. Rossi Construction Company, Inc.

[303 A.2d 146]

No. 122-72

Present: Shangraw, C.J., Barney, Smith, Keyser and Daley, JJ.

Opinion Filed April 3, 1973

*Bloomer & Bloomer,* Rutland, for Plaintiff.

*Miller & Hill,* Rutland, for Defendant.

**Keyser, J.** Plaintiff seeks by this suit to recover damages arising from injuries alleged to have been caused by the negligence of the defendant which was performing a highway improvement project on Route 103 just northerly of Ludlow, Vermont. Trial by jury resulted in a plaintiff's verdict and appeal to this Court by defendant. Defendant's exceptions are to the admission of certain evidence, to the failure to charge and to the charge.

Late in the afternoon of August 8, 1965, plaintiff left Boston, Massachusetts, to drive to Brandon, Vermont. The weather was rainy and foggy that day. The plaintiff reached the construction area on Route 103 in late evening. The construction generally followed the location of Route 103, but there were detours onto the relocated road and back onto the old route.

There came a time when the plaintiff was directed from the construction back onto the cement surface of old Route 103 for about one-half mile. He then proceeded upgrade then downhill. At the bottom of the grade there was a detour to the right from the old road downward to its intersection with Route 100. Just beyond where this detour left old Route 103 the defendant had dumped a high pile of dirt across old Route 103 to prevent traffic from travelling further on that highway. When plaintiff saw the pile of dirt, he looked for a way to get around it but there was a stonewall right close to the left side of the road and what looked like an embankment on the right. He put on his brakes but collided with the dirt at a speed of about 20 mph. He was thrown into the windshield breaking it with his head and received cuts, bruises and injuries to his shoulder, back and knee. This was about eleven o'clock at night.

The uncontradicted testimony of the Ludlow police officer who investigated the accident was that there were no warning lights at the scene, and only one unlighted flare. Also, he said that he did not remember seeing any barricades or signs of a detour and the written notes of his investigation showed none.

At the time of his accident, the plaintiff was twenty years old. By occupation he was a professional musician. He had studied musicology at the University of Illinois and had about ten years experience in the field of music, the last two being as a professional performer. As a result of the blow to his head, the plaintiff suffered a type of brain damage syndrome. He was unable to continue playing with a group as a performing musician because, as a result of his head injury, he lost his sense of rhythm. His future plans and intentions were to pursue a career as a studio musician.

Defendant's first exception was to the admission of testimony by the plaintiff respecting his future loss of earnings.

On direct examination he was asked:

"Q. Did you have some particular plan for your future life as to whether you would play as a performing musician, as an entertainer type or as a studio musician?"

The defendant's objection was overruled and the following answer given:

"A. Well, I would get into studio playing because performing requires travelling and it requires late hours at night and as you get older, you don't want to do those things. You would rather work in the daytime and that means doing studio work."

Shortly afterwards the following question and answer were allowed, again over defendant's objection that it was speculation:

"Q. Have you made a calculation based upon the union wages as to what you would—strike that—based upon your business experience in the music field and your knowledge of union rates and wages, and the hours worked, can you state with reasonable certainty the amount you would have been earning as a performing musician had you been able to retain your rhythm as you had it just prior to August 8, 1965 and the answer is yes or no, after Mr. French objects?

A. Well, assuming that I worked the least number of hours that a studio musician [does] which is 20 or 25 hours a week, then I would make $40,000 or $50,000 a year."

The defendant contends that such evidence was based upon conjecture and was improper without any basis or foundation for its admission.

The plaintiff alleged a loss of present and future wages and permanent impairment of his earning capacity in his complaint.

▉ Loss or impairment of earning capacity or power, consequent to an injury to a person, is a proper element of damages or compensation. Impairment of earning capacity relates to the diminution of earning capacity. 25 C.J.S. *Damages* § 40, at 724–25.

It is further said at p. 727:

"A person is not deprived of the right to recover damages for loss of earning capacity, or because of inability to labor or transact business in the future, by the fact that at the time of the injury he is not engaged in any particular employment, or has permanently retired from

business, or was too immature in years to have acquired an earning capacity."

See also 22 Am.Jur.2d *Damages* § 93, at 136.

In *Bell* v. *Primeau,* 104 N.H. 227, 183 A.2d 729, 730 (1962), the court held that "In actions of tort for personal injuries damages are recoverable for loss of earning capacity . . . measured by the amount of wages which [the injured person] would have earned during the period of his disability had he not been injured."

The evidence shows that the plaintiff had been in the music business for about ten years. He had played professionally with celebrity performing musicians and entertainers, one of whom became a studio musician. The evidence shows he was a very good musician and had studied musicology. Plaintiff's future plan and intention was to become a professional studio musician because, as compared to a performing musician, the pay was higher under the union rate and didn't require travelling or as long hours. As a result of his loss of rhythm due to the accident, the plaintiff had been unable to remain in his present group and could neither play as a performing nor a studio musician. Even so, he remained in the music field but as a self-employed musical arranger and copyist.

The evidence makes clear that his earning capacity had been impaired by the injury with the resulting loss sustained by reason of such impairment. The essential question was whether the plaintiff's capacity to earn was hurt. If it was, he is entitled to damages for any loss, past or future, attributable to the impairment in his earning capacity.

■ The testimony objected to strikes at the very heart of this issue and was properly admitted by the court. See *Butterfield, Admr.* v. *Community Light & Power Co.,* 115 Vt. 23, 28–29, 49 A.2d 415 (1946); *Lashin* v. *Corcoran,* 146 Conn. 512, 152 A.2d 639, 641 (1959).

■ ■ The defendant's second exception is to the failure of the court to instruct the jury on assumption of risk which defendant had pleaded as an affirmative defense. In respect to this defense, the burden of proof rested with the defendant

and required proof that the plaintiff had knowledge of the existence of the risk, appreciated the extent of the danger and freely consented to assume it. *Beck* v. *Dutra,* 129 Vt. 615, 617, 285 A.2d 732 (1971); *Cameron* v. *Abatiell,* 127 Vt. 111, 119–20, 241 A.2d 310 (1968).

■ ■ To warrant such instruction to the jury the evidence must establish a case for the application of this doctrine. This the evidence failed to do, and the court properly excluded the doctrine from its charge.

■ The defendant next claims that the court erred in charging the jury concerning damages for future pain and suffering. That part of the charge alleged to be improper is as follows:

"In this particular case the measure of damages is compensation in dollars for bodily pain and suffering, past, present and future."

and later

"You should, in your verdict, award compensation . . . for future discomfort as you may find under the evidence to be reasonably probable."

Defendant's claim is that there was no credible evidence of any future pain and suffering or discomfort. The testimony in our view establishes otherwise.

Taking the evidence in the light most favorable to the plaintiff, it shows that he had occasional pains in his lower back which he never had prior to his accident; that he injured his head when it struck and broke the windshield. The medical testimony of Dr. Jacob H. Yules, plaintiff's witness, was that from this blow the plaintiff suffered a head injury which produced some type of brain damage syndrome which had remained in force from the time of the accident—4 years.

The doctor also stated that the brain damage syndrome was sufficient in view of plaintiff's particular occupation or profession to have caused him to change his occupation within his general field. He also said that in his opinion "the injuries that he observed and treated and the effects thereof are permanent."

Dr. Yules further testified:

"The opinion that I have is that he did suffer a head injury which produced some type of brain damage syndrome which had for all intents and purposes remained in force from the time of his accident in 1965 to 1969. In my own experience in dealing with more well-defined brain damage syndromes I would expect that the majority of recovering, functional recovery would occur within a period of 18 to 24 months. Perhaps an example of this would be the amount of functional recovery that one sees in someone who suffers a stroke with fairly definite one-sided or brain damage. His immediate recovery is great, but he can still continue to exhibit recovery up to a period of a year and a half to two years. Mr. Melford apparently, although he did not have the definitive brain injury syndromes in any expertise, his symptoms continued to be symptoms of some disturbance of motor function over a four-year period. I would, therefore, assume that this was a permanent disability."

The plaintiff testified that this adversely affected his ability to work as a professional or performing musician in musical groups. This was because he found that he "just couldn't keep time." He also testified—"It concerned me plenty because I couldn't work if I couldn't keep time." The word "discomfort" used by the court in its charge is defined as "annoyance", "mental or physical uneasiness less intense and less localized than pain." Webster's Third New International Dictionary.

We are satisfied that the evidence affords a sufficient basis on the question of damages for future pain, suffering and discomfort. The issue was properly submitted to the jury for determination.

■ The defendant lastly contends the court erred in its charge to the jury.

The supplemental charge of the court as to the plaintiff "overrunning his headlights" is claimed to be an erroneous statement of the law. The charge reads:

"Ladies and gentlemen, Mr. French has called the Court's attention that the defendant did not argue or

raise the question of the plaintiff exceeding the limits of his headlights, not being able to stop within the effective range of his headlights that he did not put this into evidence either in argument or as a part of the pleadings. However, the Court does charge you that if you find from all the evidence that he was overrunning his headlights, there is an inference that he might have been operating too fast and again this is not a hard and fast or absolute rule, but something to be considered by you with all of the other evidence on the question of negligence."

Defendant took an exception to this statement "unless it is added to it what our claim actually is, that he should have been able to stop within the 75 yards because we think that this is worse now than it was before." The court did not amend or alter what it had said.

Previously the court instructed the jury relative to the rules of the road. It said:

"One of these is that an operator of a motor vehicle has a duty to have the vehicle under reasonable control and reasonable control requires that the speed of the car be reasonable under all the circumstances then and there existing. The test of ability is to stop it as quickly and as easily as circumstances may reasonably be expected to do. When this cannot be done, the inference is obvious, the car was running too fast and proper effort to control it was not made by the driver."

The plaintiff testified that in his judgment the pile of dirt appeared to be 75 yards away when he saw it. He also said that as he came over the brow of the hill, he thought his speed was about 30–35 mph along the cement highway and at the time of the impact with the pile of dirt he had slowed to about 20 mph because of putting on his brakes. It was dark at that time, and very foggy and raining.

These circumstances made control of the vehicle an important fact for the jury to determine. The court charged fully on this phase of the case and it was unnecessary for it to definitize defendant's claim that the plaintiff "should have been able to stop within the 75 yards."

■ ■ The defendant claims the plaintiff was not entitled to the charge of the doctrine of sudden emergency because he placed himself in a potential position of peril. The truth of this last statement was for the jury to decide on the evidence which was far from being conclusive of this fact. The evidence warranted the instruction of the doctrine.

■ ■ The defendant also argues in its brief that the court erroneously charged that "one can overrun his headlights and not be negligent because 'this is not a hard and fast or absolute rule.'" Even though defendant's exception did not point out this claimed error to the court, as it must do, *State* v. *Stone,* 123 Vt. 95, 96, 181 A.2d 840 (1962), it is sufficient to say that the rule is not one of invariable application. See *Slate* v. *Hogback Mountain Ski Lift, Inc.,* 122 Vt. 8, 10, 163 A.2d 851 (1960).

Defendant's claim of error as to these matters in the charge is without merit.

We have considered all of the exceptions briefed by the defendant and find no error.

*Judgment affirmed.*