## James C. Sunday v. Stratton Corporation

[390 A.2d 398]

No. 241-77

Present: Barney, C.J., Daley, Larrow, Billings and Hill, JJ.

Opinion Filed June 6, 1978

*Sylvester & Maley* and *J. William O'Brien*, Burlington, for Plaintiff.

*Paul D. Sheehey*, Burlington, and *David L. Cleary* of *Richard E. Davis Associates, Inc.*, Barre, for *amicus curiae* Vermont Ski Areas Association, Inc.

*Dick, Hackel & Hull*, Rutland, and *Paul, Frank & Collins, Inc.*, Burlington, for Defendant.

**Larrow, J.** On February 10, 1974, plaintiff, then just under 21, was injured while skiing as a paying patron on the premises of the defendant's ski resort in Stratton, Vermont. His injuries resulted in permanent quadriplegia. In the instant suit, he alleges in substance that defendant negligently maintained its ski trails and failed to give notice of hidden dangers. Trial by jury, demanded by both parties, resulted in a plaintiff's verdict for $1,500,000 and judgment for that amount plus costs. The verdict was based upon a finding that defendant's negligence was 100% the cause of plaintiff's injuries. Defendant, by its appeal, seeks in the alternative: (I) reversal of the trial court's adverse ruling on its motion for directed verdict based upon assumption of risk, and entry of judgment in its favor here, (II) reversal and remand because of claimed trial errors, including denial of a motion for mistrial and errors in the court's charge, (III) setting aside the verdict as against the weight of the evidence, and (IV) remand for new trial because of error in denying its motion to set aside the verdict as excessive. Some of its claims overlap each other, while others involve more than one asserted error. We will address the several points in the order outlined.

### (I) *Motion for Directed Verdict*

Defendant moved for directed verdict at the end of plaintiff's case and renewed the motion at the close of all the evidence. In substance, the motion was based upon its claim that recovery was precluded by the doctrine of assumption of risk, asserted to have survived adoption of the comparative negligence statute (12 V.S.A. § 1036) and to operate as an absolute bar in the instant case.

Important to any consideration of this claim is the provision of V.R.C.P. 8(c), embodying the substance of what was formerly 12 V.S.A. § 1024. Under that provision, assumption of risk is an affirmative defense, which the asserting party has the burden to "affirmatively set forth and establish." We note this burden because, in our view, the evidence adduced by the parties does not support application of the doctrine as a bar to recovery in the present case.

Viewing the evidence in the light most favorable to plaintiff, he was a novice skier, skiing on a novice trail owned and

maintained by the defendant. While traversing the trail at a speed equal to a fast walk, his ski became entangled in a small bush, or clump of brush, about 8″ by 20″, some 3–4 feet in from the side limits of the travelled portion of the trail. The brush was concealed by loose snow. Unseen by him before the accident, it was seen shortly after by himself and his skiing companion.

A novice is a beginner, the lowest classification of skier, and novice trails are designed to be easy and are more carefully maintained to compensate for the lesser skills of the users. At Stratton the trail here in question (the Interstate) is the best maintained of the many trails on the mountain. Defendant uses highly sophisticated equipment and machines for this purpose. Witness after witness, employed by and testifying for the defendant, described the procedures employed, all aimed at establishing, not that the clump of brush was an inherent danger of the sport as defendant now asserts, but that it simply was not there, as the plaintiff testified. Each witness testified that no such growth had ever been observed on the Interstate.

In laying out the trail, every effort was made to achieve a "perfect surface for skiing." After cutting of trees, elaborate machines moved everything, stumps and brush included, from the trail to achieve a "complete new surface," like a "fairway, absolutely flat." The surface was then raked and fertilized, and all stones over 3″ were removed by hand labor. Seeding was then done with a "carpetlike" grass cover to kill other growth. Any other growth was cut by hand or mower, even tall grass, because such growth is considered a danger to the novice skier. As a last step the slope was scaled "as smooth as it can be." Single shoots, as they may occur, were regularly checked and cut, and regular rolling was carried out. The Interstate, in particular, was maintained with the best base of all trails, because it was regularly used as a road by all the company equipment, which is radio controlled. Trail cutting went to within one foot of the tree line, and the packed area was about 16′ wide where the plaintiff was injured. One expert witness called by the defendant testified that any brush or shrub in the skiable portion of the Interstate should have been eliminated.

·At the time of the accident some 52 ski patrolmen were on duty, plus a trail crew charged with checking for hazards. At least 17 pieces of heavy equipment were available for use, plus other transportation. Prior to 1974, Stratton had widely advertised its world-wide reputation for trail maintenance, "meticulous grooming" and "top quality cover."

The foregoing facts are emphasized because defendant argues that, in some manner, this case is controlled by *Wright* v. *Mt. Mansfield Lift, Inc.*, 96 F. Supp. 786 (D. Vt. 1951). In that case the Federal District Court, construing Vermont law under *Erie Railroad Co.* v. *Tompkins*, 304 U.S. 64 (1938), but relying almost entirely on cases from other jurisdictions, held that a tree stump, from cutting, covered by snow on an intermediate trail, was a part of the inherent risk of the sport of skiing, assumed by the injured plaintiff and therefore barring her recovery. The accident in *Wright* occurred in 1949.

Of course, *Wright* is not a binding decision on this Court. Nor do we regard it as completely significant that since its rendition it has been cited in our decisions only twice, neither time with anything like general adoption. *Stearns* v. *Sugarbush Valley Corp.*, 130 Vt. 472, 474, 296 A.2d 220, 222 (1972); *Marshall* v. *Town of Brattleboro*, 121 Vt. 417, 420, 160 A.2d 762, 765 (1960). The simple fact of the matter is that the general rule which it lays down has wide acceptance, even by the plaintiff here. But its application to particular facts is not as simple. The general principle of *Wright* is that a person who takes part in any sport accepts as a matter of law the dangers that inhere therein insofar as they are obvious and necessary. We are not called upon here to pass upon what dangers are inherent in an intermediate trail, as in *Wright,* but we could not subscribe to the theory that a stump created by the defendant in a novice trail would be such a danger. We cannot agree that such a stump would be, in the language of *Wright,* a "mutation of nature." Nor do we subscribe to the theory that the brush here in question is such an inherent danger, given defendant's unchallenged testimony, the basis for its whole defense, that its modern methods of care have made such a growth, within the travelled trail, impossible. Arguing to the

jury its excellent grooming practices, so perfected as to render plaintiff's claim of brush in the trail impossible, may indeed present an issue as to its alleged negligence, but it does not sustain the burden of proving an assumption of risk by the plaintiff. It is clear from the evidence that the passage of time has greatly changed the nature of the ski industry. Unlike those participants eloquently described by Chief Judge Cardozo in *Murphy* v. *Steeplechase Amusement Co.*, 250 N.Y. 479, 483, 166 N.E. 173, 174 (1929), heavily relied upon in *Wright,* the timorous no longer need stay at home. There is concerted effort to attract their patronage and to provide novice trails suitable for their use. This is the state of the evidence in the case tried below; none of it was calculated to show the brush to be a danger inherent in the use of a novice slope as laid out and maintained by the defendant. Like many other fields, the "art" has changed vastly. Defendant admits as much by conceding in its brief that "the stump that injured the plaintiff in *Wright* may well be the basis for negligence today in view of improved grooming techniques." And, unlike 1949, the maintenance here is performed by the defendant itself, rather than by the communal efforts of individuals, corporations, innkeepers and the like.

Many of our cases contain language that is difficult to reconcile, in discussing the fine distinctions between assumption of risk and contributory negligence. Early cases, of course, deal with the master-servant relationship, in which field development was curtailed by the adoption of laws relating to workmen's compensation and abolishing the defense. And fine distinction between assumption of risk and contributory negligence was not important when either was an absolute bar to recovery. We will not attempt an analysis of all cases on this point, because it would serve, we feel, no useful purpose. We have stated the rule applicable to business visitors on premises, which plaintiff here admittedly was, in *Garafano* v. *Neshobe Beach Club, Inc.*, 126 Vt. 566, 572, 238 A.2d 70, 75 (1967):

> In the discharge of its duty, [defendant] was bound to use reasonable care to keep its premises in a safe and suitable condition so that plaintiff would not be un-

necessarily or unreasonably exposed to danger. If a hidden danger existed, known to the defendant, but unknown and not reasonably apparent to the plaintiff, it was [defendant's] duty to give warning of it to the latter. In those circumstances he had a right to assume that the premises, aside from obvious dangers, were reasonably safe for the purpose for which he was upon them, and that proper precaution had been taken to make them so.

Plaintiff Garafano was a softball player, injured when he stepped in a hole on the diamond leased for amusement purposes by the defendant. Accord, *Benoit* v. *Marvin*, 120 Vt. 201, 138 A.2d 312 (1958). And we have held that a ski area's responsibility towards its customers is in general the same as that of any business. *Stearns* v. *Sugarbush Valley Corp.*, *supra*, 130 Vt. at 474, 296 A.2d at 222.

There is no claim advanced here, nor could there be, that plaintiff expressly assumed any risk. The claim is that the brush was an inherent danger of the sport. This is the equivalent of, and better put as, a claim that defendant owed plaintiff no duty with respect thereto, sometimes referred to as "primary" assumption of risk. "In case of injury resulting from such a risk, the servant is denied a recovery, not because he has assumed the risk, but because the master has not been guilty of a breach of duty." *Carleton* v. *E. & T. Fairbanks & Co.*, 88 Vt. 537, 549, 93 A. 462, 467 (1915); *Springrose* v. *Willmore*, 292 Minn. 23, 24, 192 N.W.2d 826, 827 (1971); *Meistrich* v. *Casino Arena Attractions, Inc.*, 31 N.J. 44, 48–50, 155 A.2d 90, 93 (1959). See also Fleming, *Forward: Comparative Negligence at Last—By Judicial Choice*, 64 Cal. L. Rev. 239 (1976). Cast in this terminology, any chance of conflict between a comparative negligence statute and the defense of primary assumption of risk as an absolute bar to recovery becomes nonexistent. Where primary assumption of risk exists, there is no liability to the plaintiff, because there is no negligence on the part of the defendant to begin with; the danger to plaintiff is not one which defendant is required to extinguish or warn about; having no duty to begin with, there is no breach of duty to constitute negligence.

Defendant's claim here with respect to primary assumption of risk is laid to rest by two terse sentences of Mr. Justice Keyser in *Garafano, supra,* 126 Vt. at 574, 238 A.2d at 76.

> By also urging that the plaintiff assumed the risks inherent with the sport, the defendant has mistakenly associated the injury with the playing of the sport itself whereas it is not. Rather, it is the condition of the recreation field provided for the game that was the cause of the injury.

While skiers fall, as a matter of common knowledge, that does not make every fall a danger inherent in the sport. If the fall is due to no breach of duty on the part of the defendant, its risk is assumed in the primary sense, and there can be no recovery. But where the evidence indicates existence or assumption of duty and its breach, that risk is not one "assumed" by the plaintiff. What he then "assumes" is not the risk of injury, but the use of reasonable care on the part of the defendant. The motion for directed verdict was correctly denied. So also was the post-trial motion for judgment n.o.v., which involved the same questions and was not separately briefed for presentation here.

### (II) *Claims of Trial Error*

#### (a) *The Charge.*

■ Defendant argues first, with respect to the court's charge, that it failed to delineate adequately the issue of primary assumption of risk as one that must be considered separate and apart from contributory negligence. We are cited to no authority whatever for this claim, and could well disregard it as inadequately briefed. But we have examined the charge in whole and at length and perceive no basis for the contention. As we have previously noted, primary assumption of risk is really a doctrine absolving a defendant from liability because of the absence of a duty on his part. That precept is made clear and evident from the court's charge viewed as a whole. The jury was instructed that liability had to be based upon fault, the reasonableness of protective measures taken or the lack of them, and the need for determining what precautions were commensurate with

the duty of due care. Acceptance by a skier of dangers inherent in the sport, insofar as obvious and necessary, was stressed a number of times, and the jury was clearly instructed that negligence in trail maintenance or in warning of dangers was a prerequisite to recovery. The clear purport of the charge, read as a whole, required the jury to find, as a basis for any plaintiff's verdict, a duty on the part of the defendant and a breach of that duty. Liability based upon any "guarantee" of safety was expressly excluded.

Reading the charge as a whole, the claimed error is not sustained. *Paton* v. *Sawyer*, 134 Vt. 598, 600, 370 A.2d 215, 216 (1976); *State* v. *Arbeitman*, 131 Vt. 596, 602, 313 A.2d 17, 20 (1973).

The second claimed error in the charge is not clearly delineated in its scope, either in the briefs as filed by defendant or in the exception taken below. At the close of the charge, defendant excepted, *inter alia:*

> Secondly, if assumption of risk is a form of contributory negligence, the Defendant excepts to the failure of the court to so charge.

Here, it argues that:

> Even assuming that the Trial Court was not required to charge the jury as to assumption of the risk *per se,* the Court's charge was not adequate to apprise the jury of the elements of secondary assumption of the risk so that the jury could adequately evaluate secondary assumption of risk as an aspect of the plaintiff's negligence.

Notably absent from the objection as taken is any reference to the distinction between primary and secondary assumption of risk. We could well consider that the claim here urged was not adequately called to the attention of the trial court under V.R.C.P. 51. Because of the importance of this case, we elect not to do so.

Our cases have several times outlined the elements of "secondary" assumption of risk. There must be knowledge of the existence of the risk, appreciation of the extent of the danger, and consent to assume it. *Garafano* v. *Neshobe*

*Beach Club, Inc., supra,* 126 Vt. at 574, 238 A.2d at 76; *Killary* v. *Burlington-Lake Champlain Chamber of Commerce, Inc.,* 123 Vt. 256, 262, 186 A.2d 170, 174 (1962). While we have not expressly so held, in this aspect it seems now well accepted that the doctrine is logically only a phase of contributory negligence and that use of assumption of risk language is irrelevant and confusing in a jury instruction on comparative negligence. *Bulatao* v. *Kauai Motors, Ltd.,* 49 Hawaii 1, 406 P.2d 887 (1965); *Wilson* v. *Gordon,* 354 A.2d 398 (Me. 1976); *Bolduc* v. *Crain,* 104 N.H. 163, 181 A.2d 641 (1962); *McGrath* v. *American Cyanamid Co.,* 41 N.J. 272, 196 A.2d 238 (1963); *Meistrich* v. *Casino Arena Attractions, Inc., supra; Gilson* v. *Drees Brothers,* 19 Wis. 2d 252, 120 N.W.2d 63 (1963). See also James, *Assumption of Risk: Unhappy Reincarnation,* 78 Yale L.J. 185 (1968).

██ All the elements of contributory negligence were properly charged by the trial court, without objection thereto. The general content of the court's charge must not be viewed piecemeal, and as a whole it fairly outlines the issues bearing on liability. *Forcier* v. *Grand Union Stores, Inc.,* 128 Vt. 389, 396, 264 A.2d 796, 801 (1970). Beyond this, a careful search of the record reveals absolutely no evidence that the plaintiff here knew of the existence of the undergrowth before running his skis into it, and a consistent claim by defendant's witnesses that such existence was, in fact, impossible. Assumption of risk need not be charged at all where the evidence does not establish any case for its application. *Melford* v. *Rossi Construction Co.,* 131 Vt. 219, 225, 303 A.2d 146, 149 (1973). With the burden of proof on assumption of risk and contributory negligence resting on the defendant under V.R.C.P. 8(c), defendant may well have received more charge than it was entitled to.

We inject one further comment, because of various references by the defendant to a claimed "prejudicial overall impact" of the charge, and to several isolated words employed by the trial court in its rulings. We have reviewed with care the 1,094 pages of transcript in this case, mindful that circumstances invoking sympathy sometimes, perhaps unconsciously, inject an element of prejudice into a trial. Certainly the physical condition of the plaintiff could well

cause, if not justify, such a reaction. We found, however, a trial court scrupulous in its rulings, carefully considerate of all legal issues presented, patient and courteous to the parties. Any claim of lack of impartiality is not sustained by the record.

(b) *The Motion for Mistrial.*

■ At the close of plaintiff's case, defendant moved for a directed verdict in its favor and asked that the motion be heard in chambers. Although dismissing the jury, the presiding judge declined to exclude the public or to consider the motion in chambers. After hearing, the motion was denied, with the presiding judge stating the reasons for denial at some length. A resulting front page article appeared in the Burlington Free Press, headlined "Ruling May Broaden Liability of Ski Resorts." Two jurors and an alternate read only the headline, one read the headline and bottom line, one "skimmed through" the article, one read the headline and two paragraphs. In the middle of the article, seen by only one juror, was a phrase to which defendant particularly objects. That phrase stated that the presiding judge had stated "frankly" that he did not think ski areas should be allowed to operate any longer "hiding behind" the philosophy that ski accidents are a risk people assume when they go skiing.

Defendant claims an abuse of discretion in not hearing and ruling upon its motion in chambers, in the first instance, and in denying its motion for a mistrial in the second instance. We find no reversible error in either respect.

Defendant's argument on its first contention might well be termed an exercise in hindsight, imposing upon the trial court a duty to anticipate that the presence of the press will lead to the production of a prejudicial article, that it will be read by the jury despite constant admonitions on the subject (given here at each recess), and that it will influence the jury decision, despite clear instructions on what they may consider. It strains the fine line of logic when defendant argues that it need not, itself, anticipate such an "untoward development" and ask for sequestration, but that the court must foresee it and retire to chambers.

In general, we agree with the statement of Mr. Justice Brennan in his opinion concurring in the judgment in *Nebraska Press Association* v. *Stuart*, 427 U.S. 539, 587 (1976), applicable to civil cases as well as to the criminal case there involved:

> Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability.

We agree with the trial court that the general rule is that trials should be public, with chamber proceedings the exception rather than the rule. Vermont statutes favor public availability of court records, so that the filing of a written ruling rather than an oral one could have produced the same article. 4 V.S.A. §§ 652(4), 693. And the trial court was entitled to assume that the jurors would not disregard its repeated instructions relative to publicity of proceedings. *Mainieri* v. *McLellan*, 125 Vt. 157, 211 A.2d 239 (1965). The claimed abuse of discretion in hearing the motion and ruling upon it in open court does not appear.

The denial of defendant's motion for a mistrial is equally supportable as a sound exercise of discretion. Abuse of discretion must appear to justify reversal. *Marshall* v. *United States*, 360 U.S. 310, 311–12 (1959); *Woodhouse* v. *Woodhouse*, 99 Vt. 91, 153, 130 A. 758, 787 (1925); *Fraser* v. *Blanchard*, 83 Vt. 136, 145–46, 73 A. 995, 999, 75 A. 797 (1909); *Town of Peacham* v. *Carter*, 21 Vt. 515, 518–19 (1849). Since discretion involves latitude, each case must turn on its special facts, with careful notation of what action the trial court took. For this reason, defendant's reliance upon *Bellows Falls Village Corp.* v. *State Highway Board*, 123 Vt. 408, 190 A.2d 695 (1963), is misplaced. There a news article referring to the "State's welshing on its given word" was read or discussed by eight jurors, and a private

view was taken by one juror. The verdict was set aside by the trial court, and its action was affirmed. In our view the decisions in *Fraser, supra* and *Town of Peacham, supra,* are more in point. In *Fraser,* we sustained a refusal to set aside a verdict where two jurymen had read an improper article, but it did not appear they had formulated an opinion. And in *Town of Peacham,* we refused to reverse a denial of new trial where a letter, not in evidence, had gone to the jury with the exhibits, no prejudice being shown because the substance of the letter had been brought out at trial. No prejudice was made to appear in the instant case; and defendant was not, contrary to its assertion, precluded from showing such prejudice. Advised by the court that it would "do whatever counsel for the defense prefers in that area . . . will do whatever they want," defendant elected to confine itself to a single inquiry about how many jurors had looked at the front page of the Free Press. This clear election, coupled with repeated cautions and admonitions to the jury by the trial court, negates any possible resultant prejudice.

We have, in addition, compared the newspaper article with the instructions delivered by the court to the jury some days later. We perceive no inconsistency between the two. Apart from the use of the rather strong term "hide behind" the reported remarks of the trial judge bear remarkable similarity to the charge subsequently delivered. Given this consistency, and the approval we have hereinabove expressed of the charge itself, we think the trial court was quite correct in its considered judgment that prejudice was not made to appear and that the verdict was not suspect.

### (III) *The Motion To Set Aside the Verdict*

As with many of the issues involved, which the parties have carefully and skillfully briefed, there is no substantial disagreement as to the principles of law governing review of defendant's post-trial motion to set aside the verdict as against the weight of the evidence. V.R.C.P. 59 preserves the former practice. The question for review here is whether the trial court has abused its discretion to an extent that injustice would result from sustaining the ruling. The discretion of this Court is not involved, and that of the trial court should not be exercised, where different minds

can reasonably come to different conclusions on the evidence. *O'Brien* v. *Dewey*, 120 Vt. 340, 348, 143 A.2d 130, 134–35 (1958); *Russell* v. *Pilger*, 113 Vt. 537, 550–52, 37 A.2d 403, 411–12 (1944).

 Appellant argues eloquently about the need, in our consideration, to "discount the manifestly incredible or physically impossible." The principle is a sound one, but we cannot accept its application. Against two reasonably consistent versions of the accident, from plaintiff and his companion, defendant marshalled a number of witnesses who testified, in general, that they either did not see any brush at the scene of the accident, or that it was physically impossible for such growth to exist given defendant's careful grooming of the Interstate trail.

Quite apart from the usual opportunity given the trial court to observe a witness's candor and reaction, numerous other matters, apparent from the record, preclude adopting defendant's version of the accident in this Court as a matter of law. Its principal expert witness purported to qualify in so many differing fields of expertise that some of his testimony could well have been excluded. Some of his conclusions were badly shaken by cross-examination. Seven members of the ski patrol, defendant's employees, gave remarkably similar versions of the physical setting, but actual measurements were lacking, and the terrain of the whole accident scene was acknowledged by defendant to have been changed the following summer, with the involved boulder vanishing, never to be identified again. The ski patrol testimony was also badly damaged by rejection of their own entries on accident reports, denial of a transcribed statement, nonproduction of reports they claimed to have filed in the regular course of business, and admission of a group "pow-wow" to prepare their testimony just before trial with all present.

We have already reviewed at length the testimony presented by the plaintiff, and its repetition would serve no useful purpose. His story is not, in our view, anything approaching a physical impossibility, and we can easily understand the reluctance of the jury to accept the type of opinion evidence presented to discredit it. Noteworthy is the testimony of a photographic expert that infra-red photo-

graphs proved conclusively the absence of any growth under the snow, but his admission on cross-examination that they also showed no growth below the snow where two trees and a rock projected above it.

The evidence did not convince the jury that plaintiff's version of the happening was either incredible or impossible. Even absent the opportunity to observe the witnesses involved, a review of that evidence falls far short of convincing us to that effect. No error appears in the trial court's denial of defendant's motion for a new trial on the ground that the verdict was against the weight of the evidence.

## (IV) *Damages*

 Remaining for our determination is the only other issue raised by defendant on appeal, the denial of its motion for new trial because the damages awarded were excessive. Again there is little dispute about the applicable rule of law; the verdict must stand unless grossly excessive, or "entirely" excessive, where the action does not permit exact computation. *Scrizzi* v. *Baraw*, 127 Vt. 315, 322, 248 A.2d 725, 730 (1968); *Wilford* v. *Salvucci*, 117 Vt. 495, 500, 95 A.2d 37, 40 (1953). Although defendant, in the pejorative, leaves this matter to the "sound instincts" of the Court, it does not seriously contend that this is the real test. And apart from the fact that it is simply not true, its statement that our appellate review has not encompassed verdicts in excess of $65,000 has no logical conclusion. This Court does not operate in a vacuum and is fully aware that most major cases are settled rather than litigated, either because of perceptive realization of the hazard involved or limitations upon insurance coverage and other assets available to meet a claim.

 Without belaboring the point, this case is one involving almost incredible damage. Ignoring any compensation whatever for pain and suffering, the amounts involved are far in excess of the verdict returned. We do not propose to evaluate a course of treatment involving eight operations, coma, intensive care, and severe drug reaction. The degree of physical care involved, by others, takes 3½ hours each morning. There are problems of urinary and bloodstream infection, and spasmodic pain. There is a propensity to

bladder stones, and a need for all kinds of special equipment to perform the few limited bodily functions remaining to plaintiff in his quadriplegia. A film of his typical day was shown the jury without objection. Some 60 days per year of hospitalization are predicted during his remaining 50 years of life expectancy. His efforts to complete his education are fraught with incredible difficulties; he can neither work nor father children, and he has recurring fits of depression. Without financial loss, the verdict would be supportable.

But the financial losses involved are also of staggering magnitude. In round figures, required daily care by visiting and registered nurses projects to more than $875,000. Future hospitalization, even at present rates, approximates $1,500,000. Loss of future earnings is more than $300,000. One medication alone has a projected cost of $94,500. A required daytime attendant, at $3.00 per hour, comes to over $500,000. Medical bills to date approximate $70,000. Defendant did not even attempt to controvert any of these estimates or the medical evidence. Without any projected inflation, arguably offsetting reduction to present worth, financial loss to the plaintiff, standing alone, is almost twice the verdict returned.

■ The argument that the original ad damnum was only $1,250,000, and that this fact should influence the court's judgment, has little weight. Amendment, as done, was permissible. *Dupona* v. *Benny*, 130 Vt. 281, 283–84, 291 A.2d 404, 406 (1972). Apart from the manifest unfairness of permitting a party to be bound by the judgment of his counsel, we are mindful of the one year statute of limitations here involved, a special treatment accorded the ski industry. 12 V.S.A. § 513. In cases like this one, any accurate determination of prospective damage during that short period may well be impossible.

The verdict below, and the resulting judgment, cannot be said to be excessive as a matter of law.

Since no error has been made to appear, the entry must be:

*Judgment affirmed.*