NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0058-25

MARTIN MCGUINNISS and
JAMIE MCGUINNISS, his
spouse,

      Plaintiffs-Respondents,

v.

SKI CAMPGAW
MANAGEMENT LLC, SKI
BLUE HILLS MANAGEMENT
LLC, and CAMPGAW MOUNTAIN
SKI AREA,

      Defendants-Appellants,

and

COUNTY OF BERGEN,

      Defendant.

_____

**APPROVED FOR PUBLICATION**

**April 20, 2026**

**APPELLATE DIVISION**

Argued February 4, 2026 – Decided April 20, 2026

Before Judges Smith, Berdote Byrne, and Jablonski.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5138-22.

Samuel J. McNulty argued the cause for appellants (Hueston McNulty, PC, attorneys; Samuel J. McNulty and Edward J. Turro, on the brief).

Timothy J. Foley argued the cause for respondents (Davis, Saperstein & Salomon, PC, and Foley & Foley, attorneys; Matthew A. Schroeder and Timothy J. Foley, of counsel and on the brief).

The opinion of the court was delivered by

BERDOTE BYRNE, J.A.D.

In this interlocutory appeal, remanded to us from the New Jersey Supreme Court, we are asked to determine the novel question of whether the Ski Act, N.J.S.A. 5:13-1 to -11, applies to snow tubing. We conclude the Legislature intended the Ski Act to apply to snow tubing activities, and, pursuant to the facts of this case, plaintiff cannot demonstrate the operator of the snow tubing site had actual or constructive notice of a hazard he alleges caused his injuries. Therefore, we reverse the order denying defendant Ski Campgaw Management LLC summary judgment.[1]

---

[1] In its oral opinion on summary judgment, the trial court stated it was granting summary judgment on the claims against defendants Ski Blue Hills Management LLC and Bergen County. However, in its March 28, 2025 order, the court granted defendants' motion for summary judgment only as to count four, brought against Bergen County alone. As a result, defendants Campgaw and Ski Blue Hills Management appealed from the final order. We conclude the trial court's oral opinion, granting summary judgment as to the claims against both Bergen County and Ski Blue Hills Management LLC, is controlling. See Taylor v. Int'l Maytex Tank Terminal Corp., 355 N.J. Super.

I.

The record shows that on December 29, 2020, plaintiff, along with his wife and two children, went snow tubing at a site operated by Ski Campgaw Management LLC (defendant). The snow tubing hill at Campgaw is separated from the main ski slopes. At the time of the accident, it consisted of several separate lanes divided by berms of snow. Rubber deceleration mats were placed at multiple points in each lane. Employees, who communicated with one another via radios, were positioned on the top and bottom of the hill.

Before he began snow tubing, plaintiff signed a release agreement. The agreement included the following text at the top:

> I understand and acknowledge that **SNOW TUBING IS AN INHERENTLY DANGEROUS ACTIVITY**. By participating in this activity and signing this agreement: I ACKNOWLEDGE AND ACCEPT THAT CERTAIN INHERENT RISKS EXIST WHEN PARTICIPATING IN SNOW TUBING and that **I MAY SUFFER SERIOUS, IF NOT FATAL, INJURIES** as a result. I additionally **AGREE NOT TO SUE FOR INJURIES SUSTAINED** and admit that my participation is completely voluntary.

Plaintiff went down the hill "two or three" times in "various lanes" before the accident. On his final run, plaintiff opted to descend the slope lying

_____

482, 498 (App. Div. 2002) ("Where there is a conflict between a judge's written or oral opinion and a subsequent written order, the former controls."). Therefore, we refer to Campgaw as the sole remaining defendant on appeal.

3

flat on his stomach on the snow tube rather than sitting in an upright position as he had during his previous runs. This riding position was permitted by Campgaw. Plaintiff described what happened:

> I go up. They tell me to go to a lane. I went down head first. As I was going down, I noticed the mat was bunched up and it was too late. I was moving too fast. I hit it and I kind of catapulted off of it and landed on my left shoulder.

According to plaintiff, he noticed the bunched-up mat only when he was "20 or 30 feet" away, and at that point he was moving too fast to stop. The mat plaintiff hit was placed in "the middle of the hill" and was the first of several that were intentionally placed in each lane to slow down snow tubers. The mats had been in place during plaintiff's previous runs. After hitting the mat, plaintiff was "catapulted off [of the tube] and landed on [his] left [shoulder]." Upon landing, he "felt like a quick pop, pop and then it just basically got like that burning feeling." An employee at the bottom of the hill asked plaintiff if he was okay, to which plaintiff responded, "I don't know" and walked away. Plaintiff did not alert anyone about the bunched-up mat. None of plaintiff's family members witnessed the incident.

After the accident, plaintiff left Campgaw but did not speak to any employees about the injury. He then went to the hospital to receive treatment. He returned to Campgaw the next day, after speaking with a lawyer, and filled

4

out an incident report. In its description of the incident, the report states: "[G]oing head first[.] 1st mat[] was bunched up[.] Hit & flipped out of tube." Plaintiff sustained a comminuted fracture of the mid-shaft clavicle.

Discovery revealed there were forty-five incidents involving snow tubers and deceleration mats in the two winter seasons before this incident, documented by Campgaw staff on "Winter Incident Report Form[s]." No party presented evidence regarding whether any of these incidents involved a bunched-up deceleration mat.

Plaintiff filed a six-count complaint against Campgaw, Ski Blue Hills Management LLC, Campgaw Mountain Ski Area, Bergen County, and various fictitious parties,[2] alleging common law negligence and breach of the Ski Act's statutory duties. Count one alleged, against all defendants, "the careless, reckless, and negligent, ownership, operation, lease, control, supervision, management and/or maintenance and/or repair and/or inspection of the premises and/or the tubing equipment." Count two alleged defendants, as independent contractors, contributed to the "careless, reckless, and negligent upkeep and/or maintenance and/or inspection of the premises and/or the tubing equipment." Count three alleged defendants violated their duties pursuant to the Ski Act. Count four alleged defendant County of Bergen was responsible

---

[2] These fictitious parties were never served or identified.

 A-0058-25

for the injury. Count five alleged negligence on the part of "Defendants John Does 1-10 and/or XYZ Corps. 1-10." Count six was a loss-of-consortium claim made by Jamie McGuinniss, plaintiff's spouse.

The parties submitted expert reports. Campgaw's expert stated in his report that rubber deceleration mats are "equipment that is necessary for the ordinary operation of the ski area." He further stated, within the ski industry, the mats are considered "effective as deceleration assistive devices and as such, have become a generally accepted industry practice."

Plaintiff's expert also submitted a report, which concluded Campgaw "failed to reasonably observe and inspect the random placement of deceleration devices in the deceleration zone, creating an unreasonable risk of serious personal injury to its clients." However, importantly, plaintiff's expert admitted during his deposition he was not asked to opine regarding the Ski Act, which he deemed inapplicable to snow tubing. Therefore, plaintiff's expert did not posit an opinion as to whether deceleration mats are "accepted industry practice" or whether they are "obvious, man-made hazards" pursuant to the Ski Act. Instead, his expert report sounded in general negligence theories. Following a N.J.R.E. 104 hearing, the trial court ordered plaintiff's expert was "precluded from giving any opinion testimony about or referring to the New Jersey Ski Statute or its application to this case."

6

A-0058-25

The parties later stipulated to dismissing the claims against defendants County of Bergen and Ski Blue Hills Management, LLC, without prejudice. All defendants then moved for summary judgment.

The trial court agreed with plaintiff and found the Ski Act was inapplicable to snow tubing. It reasoned that snow tubing was "fundamentally different" than skiing or sledding because "there's no steering mechanism on a snow tube and no ability to control one's speed." The court denied summary judgment as to plaintiff's claims against Campgaw brought under both the common law and the Ski Act (counts one, two, three, and six).

Defendant sought leave to appeal, which we denied. It then moved before the Supreme Court for leave to appeal, which the Court granted, summarily remanding the case to us to determine whether the Ski Act applies.

II.

We review a trial court's grant of a motion for summary judgment de novo. Christakos v. Boyadjis, 262 N.J. 447, 462 (2026). Pursuant to Rule 4:46-2(c), a motion for summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." We therefore consider "whether the competent evidential

A-0058-25

materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." In re Est. of Jones, 259 N.J. 584, 594 (2025) (quoting Padilla v. Young Il An, 257 N.J. 540, 547 (2024)).

Likewise, we review questions of statutory interpretation de novo. Musker v. Suuchi, Inc., 260 N.J. 178, 185 (2025). In doing so, "[w]e ascribe to the statutory words their ordinary meaning and significance and read them in context with related provisions so as to give sense to the legislation as a whole." Borough of Englewood Cliffs v. Trautner, 260 N.J. 410, 419-20 (2025) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "If the plain language of a statute is clear, our task is complete." Savage v. Twp. of Neptune, 257 N.J. 204, 215 (2024). But if the language is ambiguous, "we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction." Trautner, 260 N.J at 420 (quoting DiProspero, 183 N.J. at 492-93) (internal quotation marks omitted). Additionally, we are "bound to apply clearly defined statutory terms." In re S.O., 482 N.J. Super. 265, 284 (App. Div. 2025).

A-0058-25

III.

A.

We begin our analysis with a review of the history of the Ski Act, which narrowly limits the liability of the operator of a ski facility and protects it from risks inherent to the activities defined in the statute. The impetus of the Ski Act was the Vermont Supreme Court's decision in Sunday v. Stratton Corp., 390 A.2d 398 (Vt. 1978). In Sunday, the plaintiff was paralyzed after skiing over a "clump of brush" concealed in the snow. Id. at 400-01. The court upheld the denial of the ski resort's motion for a directed verdict. Id. at 403. The holding in Sunday, as paraphrased by our Supreme Court, was that "the common-law doctrine of assumption of risk would no longer serve as a complete bar to skiers who seek to recover from ski-resort operators for injuries caused by hazardous trail conditions." Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 495 (1996).

Before Sunday was decided, the general rule was "[o]ne who takes part in such a sport accepts the dangers that inhere in it so far as they are obvious and necessary." Ibid. (alteration in original) (quoting Wright v. Mt. Mansfield Lift, Inc., 96 F. Supp. 786, 791 (D. Vt. 1951)). According to this rule, a collision with a snow-covered stump was considered an inherent risk of skiing. Wright, 96 F. Supp at 791. Sunday eviscerated that concept by holding "the

A-0058-25

ski area operator had a duty to maintain the slopes, and the assumption of risk doctrine could not bar suit if the injury was caused by the condition of the 'field' rather than by the 'playing of the sport' itself." Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 199 (2010) (quoting Sunday, 390 A.2d at 403).

Sunday was "uniformly . . . interpreted as broadening the potential liability of ski resorts." Brett, 144 N.J. at 495. Moreover, there remained uncertainty about the extent of ski operators' liability "because the Sunday decision essentially left open the question of where the line would be drawn between those injuries that were caused by the condition of the field, as to which the operator would be liable, and those that were the result of the playing of the sport itself, as to which assumption of the risk would bar recovery for the injured participant." Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 584 (2013).

Our Legislature passed the Ski Act to abate what it perceived to be these alarming concerns. See L. 1979, c. 29. The committee statement expressly noted Sunday's effect on ski operators' liability and sought to curtail the cost of insurance for ski resorts. See Assemb. Judiciary, L., Pub. Safety & Defense Comm. Statement to A. 1650, at 1 (Nov. 20, 1978) ("The uncertainty over what effect the Sunday case will have on the liability of ski area operators for skiing injuries has led to increases in the cost of liability insurance. It also

10

A-0058-25

poses a threat to the availability of this type of insurance which is currently provided by only a few insurers.").  As our Supreme Court noted, "[t]he Legislature's sole focus . . . was upon the continued viability of the ski industry and, in particular, the ability of resort operators to secure insurance." Angland, 213 N.J. at 584.  The Ski Act achieved those goals

> by defining the responsibilities of ski area operators, by limiting the liability of ski area operators to a breach of one of those responsibilities, and by identifying the duties of skiers, and the risks that they assume, for which the operator will not be liable.  In clear language, the Legislature provided that because of the participant's assumption of the identified risks, his or her suit arising from an injury due to any of those inherent risks would be barred.  The Legislature further made plain that the principles embodied in the comparative negligence statute would apply if the claim arose because the ski area operator breached one of its defined statutory duties.
>
> [Ibid. (citations omitted).]

Thus, the Ski Act bars any suit arising from the inherent risk of skiing or any related activity.  Only where a skier can demonstrate violation of one of the operator's narrowly-defined statutory duties may a suit proceed.  The Ski Act relieves operators from liability for injuries caused by the "inherent" risks of skiing.  N.J.S.A. 5:13-5.  "In the skiing context, an inherent risk is one that cannot be removed through the exercise of due care if the sport is to be

11

A-0058-25

enjoyed," such as "the steepness of the mountain itself."  Brett, 144 N.J. at 499-500.

The Ski Act limits the liability of operators to breaches of the duties outlined in N.J.S.A. 5:13-3(a).  Those duties require the operator to:

> (1) Establish and post a system generally identifying slopes and trails and designating relative degrees of difficulty thereof; and to make generally available to skiers information in the form of trail maps or trail reports.
>
> (2) Make generally available either by oral or written report or otherwise, information concerning the daily conditions of the slopes and trails.
>
> (3) Remove as soon as practicable obvious, man-made hazards.
>
> [Ibid. (emphasis added).]

Thus an operator is not liable for injuries caused by:  (1) "[a]brupt changes in weather conditions"; (2) "[h]azards normally associated with the varying conditions of snow"; or (3) equipment and facilities "necessary for the ordinary operation of the ski area" that are clearly marked and are not obvious, man-made hazards that can be practicably removed.  N.J.S.A. 5:13-3(b)(1) to (3).

An operator's liability pursuant to N.J.S.A. 5:13-3(b)(3) is further circumscribed unless it knew or should have known of the enumerated violation and it had a reasonable time to correct it.  N.J.S.A. 5:13-3(d) ("No

12

A-0058-25

operator shall be liable . . . unless said operator has knowledge of the failure to comply with the duty imposed by this section or unless said operator should have reasonably known of such condition and having such knowledge has had a reasonable time in which to correct any condition or comply with any duty set forth in this section."). Thus, the Ski Act bars actions for injuries that are inherent to the sport or caused by equipment or facilities necessary for the ordinary operation of the ski area, unless the operator has actual or constructive knowledge of an obvious, man-made hazard that could have been practicably removed and reasonable opportunity to cure it.

The duty to remove "obvious, man-made hazards" is simply a restatement of the "proposition that operators have no duty with regard to inherent risks of skiing." Brett, 144 N.J. at 500. In using the phrase "obvious, man-made hazards," the Legislature "cast[] a wide net." Ibid. "[O]bvious, man-made hazards" include man-made alterations to the natural environment:

> The placement of ski-lift towers, the use of artificial snow, and the layout of the trails all are man-made contributions to the skiing environment. Thus, for example, a jury could reasonably find that a tree left standing in the middle of a blind corner on a steep trail was an "obvious, man-made hazard," but that a tree was an inherent risk when it stood at the edge of a broad and straight fairway. . . .
>
> . . . Some man-made features of a ski slope are as inherent to the sport of skiing as the steepness of the mountain itself. One cannot have skiing without,

13

A-0058-25

for example, towers to support the ski lift. A danger that may feasibly be removed, however, is not an inherent danger. A jury might properly find that a ski-lift tower placed where skiers might be expected to crash into it is a non-inherent, man-made risk if it could have been placed in a safer location.

[Id. at 500-01.]

The existence of an "obvious, man-made hazard" is generally a jury question. Id. at 505.

The Act also enumerates duties applicable to skiers, see N.J.S.A. 5:13-4, such as the duty to control their speed and remain on designated trails, N.J.S.A. 5:13-4(c), (f).

B.

At issue before the trial court was whether snow tubers are included in the definition of "skiers" as set forth in the statute because, where the Ski Act applies, it completely "displace[s] the common law with regard to the statutorily defined parties." Brett, 144 N.J. at 502. The Ski Act's "codification of rights and remedies applies only between parties defined as skiers or ski-area operators." Id. at 496.

"Skier" is defined as "a person utilizing the ski area for recreational purposes such as skiing or operating toboggans, sleds or similar vehicles, and including anyone accompanying the person." N.J.S.A. 5:13-2(c) (emphasis added). "Operator" is defined as "a person or entity who owns, manages,

14

controls or directs the operation of an area where individuals come to ski, whether alpine, touring or otherwise, or operate skimobiles, toboggans, sleds or similar vehicles and pay money or tender other valuable consideration for the privilege of participating in said activities."  N.J.S.A. 5:13-2(a) (emphasis added).  "Ski area" is defined as including "all of the real and personal property, under the control of the operator . . . including but not limited to all passenger tramways, designated trails, slopes and other areas utilized for skiing, operating toboggans, sleds, or similar vehicles during the skiing season."  N.J.S.A. 5:13-2(b) (emphasis added).

We conclude a snow tuber is included in the definition of "skier" within the Ski Act because a snow tube is a "similar vehicle" within the meaning of those statutory definitions.  More specifically, snow tubes are "similar vehicles" within the meaning of the Ski Act's definitions because they are used for a snow-based recreational activity, as are toboggans, skis, and sleds.  The term "similar vehicle" in N.J.S.A. 5:13-2(a) to (c) is preceded by other winter activities—skiing (alpine or touring), tobogganing, sledding, and operating skimobiles—all of which involve sliding across snow-covered terrain and are subject to the same variables as traditional skiing and its attendant risks, including surface issues, ice, pitch, ruts, speed congestion, run outs, and weather.  Snow tubing fits comfortably into this class of activities.  In fact,

15

snow tubing can easily be classified as a subcategory of sledding or tobogganing.

We would reach the same conclusion even if the word "similar" were omitted from the Ski Act's definitions. According to the ejusdem generis canon of interpretation, "where general words follow specific words in an enumeration . . . the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." Williams v. N.J. State Parole Bd., 255 N.J. 36, 53 (2023) (emphasis added) (quoting 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 47:17, at 364-68 (7th ed. 2022)). Here, the general word "vehicle" is preceded by a specific enumeration of winter activities— tobogganing, sledding, skiing, etc. If the ejusdem generis canon is applied, the word "vehicle" would not be construed broadly to include cars or airplanes, but only to embrace the objects "similar in nature . . . [to] the preceding specific words." Ibid. Thus, "vehicle" would mean a device used for traversing snow-covered terrain. Such an interpretation encompasses snow tubes.

Contrary to the trial court's ruling, the participant's ability to control the vehicle is not dispositive of whether the activity is included in the statute. Although portions of the Ski Act impose certain duties on skiers, such as the duty to control their speed and remain on designated trails, N.J.S.A. 5:13-4(c),

(f), we are required to read the legislation as a whole.  See W.S. v. Hildreth, 252 N.J. 506, 518 (2023) ("Pursuant to traditional rules of statutory construction, 'each part or section should be construed in connection with every other part or section to provide a harmonious whole.'" (quoting In re Civil Commitment of W.W., 245 N.J. 438, 449 (2021))).  Nothing in the statute limits the types of toboggans, sleds, or "similar vehicles" to those whose speed may be controlled.

Aside from the plain language of the statutory definitions, when we consider the Ski Act as a whole, we easily conclude that the Legislature intended the Act to apply to snow tubing.  The Ski Act's statement of purpose provides "that the sport of skiing and other ski area activities involve risks which must be borne by those who engage in such activities and which are essentially impractical or impossible for the ski area operator to eliminate." N.J.S.A. 5:13-1(b).

The inherent risks the Ski Act addresses are relevant to snow tubing as much as they are to tobogganing, skiing, or sledding.  Snow tubing involves sliding downhill at high speeds and sometimes falling out of the snow tube. As is the case with skiing or sledding, these are wholly foreseeable risks that cannot be eliminated without taking the enjoyment out of the activity.  See Brett, 144 N.J. at 499 ("[A]n inherent risk is one that cannot be removed

17

through the exercise of due care if the sport is to be enjoyed."). Additionally, snow tubers, like skiers, tobogganers, and sledders, may be injured by "[a]brupt changes in weather conditions" and "[h]azards normally associated with the varying conditions of snow or undercover." N.J.S.A. 5:13-3(b)(1) to (2).

In passing the Ski Act, the Legislature was concerned with the increased cost of insurance for ski operators. See Assemb. Judiciary, L., Pub. Safety & Defense Comm. Statement to A. 1650, at 1. The rationale of the Ski Act— reducing those costs by eliminating an operator's liability for inherent risks—is equally applicable to snow tubing and it has been extended previously to cover other snow-sport activities such as snowboarding. See also Murray v. Great Gorge Resort, Inc., 360 N.J. Super. 395, 399-400 (Law Div. 2003) (concluding snowboarders are covered by the Ski Act because they are "exposed to the identical risks as traditional down-hill skiers," and "it would frustrate . . . the underlying goals of the Ski Statute to exclude snowboarding.").

Plaintiff asks us to remove the activity of snow tubing from the purview of the Ski Act. We decline to do so, and we disagree with plaintiff's assertion that snow tubing "is a fundamentally different activity than sledding or skiing" because a snow tuber "has no control over the speed or course nor any mechanical br[aking] method."

18

A-0058-25

According to plaintiff, it would be illogical to interpret the Ski Act to apply to snow tubing when other provisions of the Act require "skier[s] . . . [to] maintain control of [their] speed and course at all times." See N.J.S.A. 5:13-4(c). We find this argument unpersuasive. First, while snow tubes lack braking or steering mechanisms, this fact does not make snow tubes "fundamentally different" than most sleds or toboggans, which also lack those mechanisms. Second, even though most snow tubes lack mechanical features allowing them to be steered or braked, it remains possible for a rider to control the speed and direction of the snow tube as it moves downhill. To control speed, riders may drag one or both of their feet on the snow. To control direction, riders may shift their weight, push off the berms on either side of the lane, or descend headfirst to accelerate. In fact, the signs posted at Campgaw directed snow tubers to drag their feet "to maintain direction and stability." Therefore, the claim that snow tubes are so uncontrollable as to be "fundamentally different" than sleds or toboggans is belied by the facts.

We conclude the Ski Act applies to snow tubing. Because the Ski Act displaces the common law when applicable, see Brett, 144 N.J. at 502, we reverse the trial court's denial of summary judgment with respect to plaintiff's common law claims (counts one, two, and five). The common law claims are

19

extinguished as the Ski Act provides the sole means of asserting liability against defendant.

C.

Having ascertained the Ski Act applies, it imposes limited, enumerated duties on the operator, including the duty to "[r]emove as soon as practicable obvious, man-made hazards." N.J.S.A. 5:13-3(a)(3).

Generally, whether a deceleration mat is part of equipment and facilities "necessary for the ordinary operation of the ski area," which is clearly marked, and is not an "obvious, man-made hazard[]" that can be practicably removed, is a question of fact. See Brett, 144 N.J. at 505 ("[W]e believe that the trial court properly left to the jury the question of whether an obvious, man-made hazard existed, given the fact-intensive nature of this issue and its relation to the balancing of fault."). However, in this case, plaintiff has not presented any genuine issue of material fact to demonstrate the deceleration mat, either as presented at the area or in a "bunched up" condition as plaintiff alleged, was an "obvious man-made hazard" requiring removal pursuant to the statute. Additionally, plaintiff has not shown either that the mat was unnecessary for the ordinary operation of the area or inadequately marked.

Specifically, plaintiff's expert refused to opine as to the applicability of Ski Act at his deposition because of his legal conclusion that the Act did not

20

apply to plaintiff's use of a snow tube. As a result, Campgaw's expert opinion, that deceleration mats are equipment "necessary for the ordinary operation of the ski area" and were clearly visible, is uncontroverted. The trial court ruled plaintiff's expert was barred from addressing any aspect of the Ski Act. Moreover, even if he had been allowed to opine, plaintiff's expert acknowledged deceleration mats are ordinary equipment necessary for snow tubing operations.

And, if we assume, at this summary judgment stage, plaintiff may give lay testimony to a jury positing deceleration mats are an obvious, man-made hazard, plaintiff still cannot set forth any evidence the mat was bunched up before he began his last, fateful run that day sufficient to defeat defendant's motion for summary judgment. Defendant's duty to remove man-made hazards is limited by actual or constructive knowledge of the hazardous condition. N.J.S.A. 5:13-3(d). Notice and a reasonable opportunity to cure are essential components to plaintiff's claim that defendant violated one of the duties listed in N.J.S.A. 5:13-3(a). The statute codified the common law in this respect. See Prioleau v. Kentucky Fried Chicken, Inc., 223 N.J. 245, 257 (2015) ("[A]n invitee seeking to hold a business proprietor liable in negligence 'must prove, as an element of the cause of action, that the defendant had actual or

21

constructive knowledge of the dangerous condition that caused the accident.'" (quoting Nisivoccia v. Glass Gardens, Inc., 175 N.J. 559, 563 (2003))).

At his deposition, plaintiff testified the bunched-up mat only became visible after he started descending the slope. According to Mitchell's testimony, Campgaw's employees were positioned on the top and bottom of the hill and communicated with radios to make sure the run was clear before sending the next snow tuber down the designated lane. Mitchell stated in his deposition that employees would communicate about hazards in the tubing lanes:

> Q. So a person from the top of the hill, the top attendant can look at the mats at the bottom of the hill and walkie-talkie to someone to the bottom that there's a problem with the mat; is that fair?
>
> A. Yes.
>
> Q. That could have been done if there was an issue?
>
> A. All the time, eyes always on the hill.

And in the event of a hazard in one of the tubing lanes, Mitchell stated, "We always shut down the lanes and make the repairs known. Everything is visualized and walkie-talkied that all lanes are clear, go ahead and send it." Plaintiff cannot establish actual notice sufficient to defeat summary judgment.

Constructive notice is also lacking. Although in the two seasons before plaintiff's accident there were over forty-five incidents in which snow tubers

22

A-0058-25

either flipped over or were thrown off their tubes after running into deceleration mats, there was no evidence presented that these accidents were caused by mats bunching, or regarding the general propensity of these mats to bunch, or whether steps could have reasonably been taken to keep the mats from bunching, or whether other facilities utilize different equipment to facilitate deceleration and prevent bunching-related incidents. Therefore, even assuming, as we must, the deceleration mat was bunched up, plaintiff has not presented any evidence of defendant's actual or constructive notice that the mat was bunched up before he began his run sufficient to defeat defendant's motion for summary judgment.

Finally, we briefly address the argument that the exculpatory agreement bars plaintiff's claim. Because the Ski Act applies, an agreement attempting to waive the ski operator's statutorily imposed duties is against public policy and thus unenforceable—which defendant conceded before the trial court. See Hojnowski v. Vans Skate Park, 187 N.J. 323, 333 (2006).

Reversed. We remand for an order dismissing plaintiff's claims with prejudice. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

23