*Ziniti v. New England Central R.R., Inc.*, No. 260-3-14 Cncv (Mello, J., Nov. 3. 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| MATTHEW ZINITI,<br> Plaintiff<br><br>v.<br><br>NEW ENGLAND CENTRAL<br>RAILROAD, INC., et al.,<br> Defendant | Docket No. 260-3-14 Cncv |

## RULING ON MOTIONS IN LIMINE

Introduction ........................................................................................................................ 2

   Plaintiffs's First Combined Motion in Limine to Exclude Evidence (#44) ................................ 3

     1.   FRA/Vermont Accident Prediction Formulas .................................................... 3

     2.   Plaintiff's ADD/ADHD ................................................................................ 5

     3.   Prior Accident History at Crossing ................................................................. 5

     4.   Railroad Grade Crossing Accidents Generally Caused by Motorists ........................ 5

     5.   Hughes' "Audit" of Contract with Mississippi Department of Transportation ............ 6

     6.   "The Rustic," a Bar Ziniti Lived Above .......................................................... 6

     7.   Ziniti Never Filed a Tax Return ..................................................................... 6

     8.   Railroad "Crossbuck" Sign Hanging in Ziniti's Apartment .................................. 7

     9.   Any Comment/Suggestion/Argument that Drivers Should Stop, Look, and Listen .... 7

     10.   Duty to stop if driver has not heard/seen train or any sign/signal requiring stop ........ 8

     11.   Plaintiff should stop closer than 15 feet to look for a train that he has not previously seen or heard .............................................................................................. 9

     12.   Paraphrasing Legal Duties ............................................................................ 10

     13.   Analogies between railroad-highway grade crossings and roadway intersections ..... 11

     14.   Braintree "Braking Reaction Time" ............................................................... 11

     15.   Speculating that Ziniti was on Cell Phone/Playing with IPod at Time of Accident .. 12

     16.   Comment/Insinuation re: Suicide ................................................................... 12

17. Signs at the crossing were adequate or were "warning signs of choice" ................... 12

Plaintiff's Railroad Crossing Expert Williams Hughes (# 60) ............................................. 12

Crossing Designation Dispute (# 57) .................................................................................. 14

Prior Accident Crossing History (# 56) .............................................................................. 16

Prior Crossing "Incident" and News Reports (# 59) ........................................................... 17

Ziniti's Potential Commission as Active Duty Military Officer (# 45, 61, and 65) ................. 21

Evidence that Ziniti Would Have Commissioned (Gen. McCarthy) (# 65) ......................... 21

Evidence that Ziniti Would Not have Commissioned (Gen. Bromberg) (# 45) .................. 29

Norwich University Military Affidavits (Schneider, Smith, and Stafford) (# 61)............... 29

Ziniti's Social Media Postings and Comments (# 43 and 64) ................................................ 31

Permanent Cognitive Deficiencies (# 62) ........................................................................... 35

Dr. Randall Benson, Ziniti's Expert Neurologist (# 63) ...................................................... 38

Vocational Limitations and Lost Earning Capacity (# 58) ................................................... 41

Order ................................................................................................................................... 42

## Introduction

This is a negligence action arising from a train–automobile collision. Plaintiff Matthew Ziniti was injured when the vehicle he was driving collided with a train operated by Defendant New England Central Railroad, Inc. ("the Railroad") at a grade crossing on Slaughterhouse Road in Northfield Falls, Vermont in 2011. Ziniti alleges various theories of negligence against the Railroad, including limited crossing visibility and insufficient signage.

A prior ruling by the court addressed motions for summary judgment, a related motion to strike, and a motion for sanctions. *See* Ruling on Pending Motions (Jan. 31, 2017). The court recently denied the Railroad's motion to reconsider the partial denial of its motion for summary judgment. *See* Ruling on Defendants' Motion to Reconsider (Oct. 18, 2017). Now before the court are 13 motions in limine. John Evers, Robert Pottroff, Mark Parrish, Thomas Barron, and Joshua Sanders, Esqs. represent Ziniti. Jeffrey Spencer, Michael Flynn, Matthew Cianflone, and Lori Wirkus, Esqs., represent the Railroad.

<u>Plaintiffs's First Combined Motion in Limine to Exclude Evidence (#44)</u>

Ziniti's combined motion in limine actually consists of 17 distinct motions in limine, each seeking to preclude particular evidence or argument. The court addresses each of those motions in turn.

1.  <u>FRA/Vermont Accident Prediction Formulas</u>

The FRA and/or Vermont accident prediction formulas are a method of analysis used in the railroad industry to evaluate the safety or accident potential of specific crossings. They are used by state and federal authorities to determine if additional warning devices are warranted at those crossings. Ziniti seeks to exclude those formulas as inadmissible under a federal statute. That statute provides:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

23 U.S.C. § 409; *see also* <u>Robertson v. Union Pac. R. Co.</u>, 954 F.2d 1433, 1434–35 (8th Cir. 1992) (affirming trial court's exclusion of Arkansas Highway Department's railroad crossing hazardousness formula and automobile count because they were compiled and used by highway department "pursuant to 23 U.S.C. § 130(d) for purposes of monitoring and improving highway railroad crossing safety," as well as newspaper article using data compiled by highway department and identifying that crossing as the most hazardous in the state).

The plain language of this statute "excludes from evidence all data compiled for purposes of highway and railroad crossing safety enhancement and construction for which a state receives federal funding." Id. at 1435. Courts have recognized that "the underlying intent of the statute is to 'facilitate candor in administrative evaluations of highway safety hazards,' id. (quoting Duncan v. Union Pacific R.R. Co., 790 P.2d 595, 597 (Utah Ct. App. 1990)), and to "prohibit federally required record-keeping from being used as a 'tool . . . in private litigation.'" id. (quoting Light v. State, 560 N.Y.S.2d 962, 965 (N.Y. Ct. Cl. 1990)).

In addition to the Robertson court, many state courts have also applied 23 U.S.C. § 409 to exclude this type of evidence in a state court proceeding. *See*, *e.g.*, Claspill v. Missouri Pac. R. Co., 793 S.W.2d 139, 139–40 (Mo. 1990) ("a list of the most dangerous railroad crossings in Missouri and a Field Inspection Form proposing the addition of flashing signal lights at the Adrian crossing, compiled by the Public Service Commission and the Highway and Transportation Department"; application of federal statute did not violate 10th Amendment); Sawyer v. Illinois Cent. Gulf R. Co., 606 So. 2d 1069, 1072 (Miss. 1992) (affirming exclusion of testimony and exhibits of state highway department officials regarding hazardousness of crossing, and holding that federal statute is binding on state courts under Supremacy Clause); Palacios v. Louisiana & Delta R.R. Inc., 740 So. 2d 95, 101 (1999) ("information gathered by the state as part of its general examinations of all railroad crossings in the state, in order for the appropriate state and federal administrators to determine which crossings may need improvement and to qualify for federal funding for these improvements, falls within the protective scope of section 409"). *Cf*. Pierce Cty., Wash. v. Guillen, 537 U.S. 129, 145 (2003) (holding that § 409 protects "not just the information an agency generates, i.e., compiles, for § 152 purposes, but also any information that an agency

4

collects from other sources for § 152 purposes," and further holding that § 409 does not violate Commerce Clause).

Absent a better argument from the Railroad explaining how the federal statute does not apply to the specific accident prediction formulas it wishes to use, the court will exclude those formulas.

### 2. Plaintiff's ADD/ADHD

Ziniti seeks to exclude evidence or argument that he was more likely to be involved in a grade crossing collision than other people because of ADHD or the fact that he had discontinued medication for ADHD, or that those factors contributed to cause the collision. The Railroad's proffer is based only on the facts that Ziniti has ADHD and statistics concerning other accidents involving male drivers with ADHD. Its expert's opinion that Ziniti increased his chances of a motor vehicle crash by continuing to not take ADHD meds is admittedly based only on statistics from a 2014 article. That is pure speculation. The court will exclude any ADHD evidence or argument that Ziniti was more likely to be involved in an accident because he had ADHD.[1]

### 3. Prior Accident History at Crossing

This issue is fully briefed in a more expansive and substantive motion in limine (# 56). The court will address it in that context below.

### 4. Railroad Grade Crossing Accidents Generally Caused by Motorists

The Railroad contends it is a generally accepted fact in the railroad industry that accidents at grade crossings are almost always caused by motor vehicle operator error, *see* Defs.' Ex. J to MPR # 44 (Assoc. of Am. R.R.s, Highway-Rail Grade Crossing Safety) ("safety at grade crossings, by its nature, is primarily a motorist's responsibility"), and that referencing this fact at trial goes

---

[1] Evidence that Ziniti had ADHD, however, may be relevant to other aspects of this case, as discussed <u>infra</u>.

to two important issues: (1) whether the crossing was ultrahazardous, and (2) the process by which traffic engineers analyze what devices are appropriate at crossings. Ziniti seeks to exclude this evidence as irrelevant because it constitutes a generalization about what may have caused other dissimilar grade crossing accidents at different locations involving different people. The court agrees. Moreover, the fact asserted by the Railroad is not even supported by the exhibit it cites.

### 5. Hughes' "Audit" of Contract with Mississippi Department of Transportation

The Railroad reiterates that it has the right to cross-examine Hughes on his background and opinions in relation to his prior work on behalf of railroads, especially with respect to making traffic control recommendationss. However, it concedes that it does not presently intend to question him about the audit of his contract with the Mississippi Department of Transportation. Therefore, the court will issue no ruling on this motion. If it changes its mind, the Railroad shall seek permission from the court before any such questioning.

### 6. "The Rustic," a Bar Ziniti Lived Above

Ziniti's apartment at the time of the train collision was above "The Rustic," a bar in Northfield. Ziniti does not object to evidence of the fact that he lived in an apartment above The Rustic, or questioning about its location and proximity to railroad tracks. The court will exclude any comments or arguments related to the fact that Ziniti lived above The Rustic used to suggest, assert, or insinuate that Ziniti was drinking about the time of the accident or otherwise did something improper, or to attack his character. The parties appear to be in agreement on this point.

### 7. Ziniti Never Filed a Tax Return

The Railroad contends this fact goes to Ziniti's post-accident residual earning capacity and failure to mitigate damages by obtaining gainful employment. Ziniti counters that he never filed a return only because he never made enough money to file a return, and that introduction of the fact

that he never filed a return would be unduly prejudicial. The court agrees that the fact that Ziniti never filed a tax return is wholly irrelevant and unduly prejudicial, and will exclude that fact. The Railroad can bring up Ziniti's attempts to obtain gainful employment through other evidence.

8. Railroad "Crossbuck" Sign Hanging in Ziniti's Apartment

Ziniti had a crossbuck sign hanging in his room at the time of the accident. To the extent Ziniti attempts to argue that the signage present at the crossing was inadequate, the Railroad asserts it is entitled to confront that argument with the fact that Ziniti was familiar with the exact sign present at the crossing on the day of the collision. Ziniti does not contend that he was unfamiliar with a crossbuck sign. As this fact is not unduly prejudicial, the court will permit evidence of the railroad "crossbuck" sign hanging in Ziniti's apartment, for whatever minimal relevance it may be.

9. Any Comment/Suggestion/Argument that Drivers Should Stop, Look, and Listen

Specifically, the Railroad intends to reference Ziniti's deposition testimony where he stated: "Now, if you get to a railroad crossing that doesn't have any lights and gates, for example, . . . the crossbuck crossing, you stop, you listen for a train, and if you don't hear anything coming, you proceed across the tracks with caution." Shortly thereafter in that same deposition, Ziniti stated he had said that mistakenly, and corrected himself: "I know that when you come to a crossbuck crossing, that you are supposed to look and listen, you're not supposed to stop." These inconsistent statements regarding Ziniti's knowledge of what a driver is supposed to do at a railroad crossing go to Ziniti's credibility. The court will permit the Railroad to reference Ziniti's initial comment that "you stop" at a crossbuck crossing before proceeding across the tracks. Ziniti's counsel may then rehabilitate his client by referencing Ziniti's subsequent statement purportedly correcting himself, that "you're not supposed to stop."

7

10. <u>Duty to stop if driver has not heard/seen train or any sign/signal requiring stop</u>

The duties of a driver approaching a railroad crossing are set forth in statutes and summarized in <u>Mobbs</u>:

> A driver approaching a railroad grade crossing shall stop within fifty feet of but not nearer than fifteen feet from the nearest rail of the railroad and may not proceed until he can do so safely when an electric or mechanical signal device gives warning of the immediate approach of a railroad train, a railroad train approaching within eighty rods, or 1,320 feet of a highway crossing emits a signal audible from that distance and the train by reason of its speed or nearness is an immediate hazard or a railroad train is plainly visible and is in hazardous proximity to or is at the crossing.

<u>Mobbs v. Central Vermont Ry., Inc.</u>, 155 Vt. 210, 221 (1990). A driver need not stop at a crossing in all circumstances. Instead, as stated in <u>Mobbs</u>, a driver *must* stop only in certain distinct circumstances, two of which might be applicable here: (1) an approaching train is within a certain distance of the crossing, emits a signal audible from that distance, and is an "immediate hazard" due to its speed or proximity; or (2) an approaching train is "plainly visible" and is in hazardous proximity to or is at the crossing. When this duty to stop arises, the driver must stop prior to fifteen feet from the nearest rail. A duty to stop may also arise in an additional circumstance: "When a motorist is temporarily blinded, it is his duty either to stop until his vision is restored or to reduce his speed and have his car under such control that he can stop it immediately . . . ." <u>Id</u>.

The court expects that, at trial, the Railroad will argue that Ziniti should have stopped because one of the above circumstances was present. Ziniti will likely argue that he had no duty to stop because those circumstances requiring a driver to stop were not present. The presence of those circumstances is a matter for the jury to decide. Either party may, of course, elicit testimony relevant to proving the existence or nonexistence of those circumstances. The Railroad shall not

8

misstate the law by arguing that Ziniti had a duty to stop absent the presence of circumstances requiring a driver to stop.

In ruling on summary judgment, the court stated: "If contributory negligence still controlled, the court would grant summary judgment for the Railroad, because any reasonable jury must find that Ziniti's negligence was a cause of the collision." Ruling on Pending Motions at 33 (Jan. 31, 2017). The Railroad indicates that it plans to "make this ruling a part of their case." Defs.' Opp'n to Pl.'s Combined Motions. in Limine at 9. It may not do so. The court had intended that sentence in its ruling to be dicta. Regardless, neither the court nor the parties will inform the jury that Ziniti was negligent to some degree as a matter of law, or reference the court's earlier ruling. After all the evidence is presented, the court may consider whether an instruction on that issue is warranted.

11. <u>Plaintiff should stop closer than 15 feet to look for a train that he has not previously seen or heard</u>

The Railroad asserts it is entitled to argue that Ziniti should have stopped his vehicle closer than 15 feet before the crossing if he felt he had an obstructed sightline. Ziniti contends this would be a misstatement of the law. <u>Mobbs</u> and the pertinent statute provide that a driver shall stop "not nearer than 15 feet from[] the nearest rail of the railroad . . . ." 23 V.S.A. § 1071(a); *see also* <u>Mobbs</u>, 155 Vt. at 221–22. <u>Mobbs</u> further states that "[w]hen a motorist is temporarily blinded, it is his duty either to stop until his vision is restored or to reduce his speed and have his car under such control that he can stop it immediately . . . ." <u>Id</u>.; *see also* <u>Starr's Transp., Inc. v. St. Johnsbury & Lamoille Cty. R.R.</u>, 123 Vt. 376, 380 (1963) ("It was the duty of the driver to look and listen for approaching trains as he neared the crossing until the last moment when the discovery of the train would have availed for his protection.").

At first blush, there appears to be some contradiction in the statutes and caselaw about whether motorists are permitted to stop within 15 feet of railroad tracks. However, taken to its logical extreme, Ziniti's argument is nonsensical. Essentially, he argues that Mobbs and § 1071 preclude him from ever stopping within that zone. Under that logic, after not seeing or hearing a train at the 15 foot point, he could simply barrel through the crossing without a care in the world, absolved of all responsibility. Surely, that cannot be the law. A fair reading of the relevant authorities is that a motorist approaching a visibly obstructed crossing who is not required by law to stop at the 15 foot point shall proceed carefully, continuing to look and listen for an approaching train, and ready to stop if necessary. Even Mobbs implies as much. *See* Mobbs, 155 Vt. at 221 (after stopping, driver "may not proceed until he can do so safely"). Proceeding safely through a crossing with limited visibility may require stopping relatively close to the tracks. Mobbs does not prohibit motorists from ever stopping within 15 feet of the tracks when necessary.

Here, the exact point at which a driver can see an oncoming train at this crossing is a disputed fact. *See* Ruling on Pending Motions at 24 n.11. The Railroad may argue that Ziniti should have stopped within 15 feet of the tracks if there is evidence that the view was obstructed so that he could not see the train until after that point, and that he could have stopped safely.

### 12. Paraphrasing Legal Duties

This issue appears to be duplicative of the issues discussed in numbers 9 through 11 above. The Railroad may explore Ziniti's driving practices. The Railroad may also explore whether Ziniti adhered to his responsibilities as a driver, without instructing the jury on what the law requires. Beyond that, the court cannot make a ruling without a more specific proffer and objection. Any further ruling on this point must be deferred until trial.

13. Analogies between railroad-highway grade crossings and roadway intersections

The Railroad contends that, because this case involves a "straightforward motor vehicle accident," the jury is allowed to use common sense and experience. It cites to the Federal Highway Administration Railroad-Highway Grade Crossing Handbook, which states that "grade crossings may be viewed as simply a special type of highway intersection." Therefore, the Railroad asserts, the jury should be permitted to evaluate the crossing based on their experience with other railroad crossings and roadway intersections. Ziniti contends that the duties of drivers at railroad-grade crossings is different from a motorist's duty to yield at a regular vehicular intersection, and an analogy between the two would be misleading. However, such an analogy does not appear to be prejudicial. The court will permit the Railroad to make such an analogy, and Ziniti may then use cross-examination or rebuttal to demonstrate why such an analogy is misplaced or has limited applicability here. Ultimately, the jury will determine how helpful such an analogy will be.

14. Braintree "Braking Reaction Time"

Ziniti took a test to measure his "braking reaction time" eight months after the accident in Braintree, Massachusetts. The results of that test indicated that he had recovered to the extent he was able to drive again. This evidence is relevant to the occurrence of the accident and his recovery. It is a fair inference that Ziniti's braking reaction time just prior to the accident was probably as fast or faster than his reaction time as measured eight months later, following a serious accident, and this tends to rebut the argument that he did not have enough time to stop at the crossing. It is also probative of his recovery, which goes to damages. Moreover, this evidence is not prejudicial. The court will permit evidence of the Braintree "braking reaction time."

11

### 15. Speculating that Ziniti was on Cell Phone/Playing with IPod at Time of Accident

While it is undisputed that music was playing over the stereo speakers in Ziniti's vehicle, there is no evidence that he was manipulating his cell phone or playing with his IPod at the time of the accident. The court will exclude any such speculation.

### 16. Comment/Insinuation re: Suicide

There is no evidence this accident was the result of an attempted suicide, and the Railroad does not oppose this motion. Ziniti's motion to exclude any comment, suggestion, or insinuation of an attempted suicide is granted.

### 17. Signs at the crossing were adequate or were "warning signs of choice"

Ziniti claims it is prejudicial to argue that the signs in place at the crossing were adequate. Although the court ruled that the placement of the crossbuck sign on the left instead of the right and the lack of an advance warning sign could not have proximately caused the collision, Ziniti contends that the signs in place (or not in place) were still technically improper. Ziniti's motion to exclude such argument is denied. The Railroad's main argument is that the sign present at the crossing was adequate, such that additional warning devices were unnecessary. Ziniti will then argue that the crossbuck sign was inadequate because additional devices were needed. Calling the crossbuck sign "adequate" in this sense is not prejudicial.

### Plaintiff's Railroad Crossing Expert Williams Hughes (# 60)

The Railroad seeks to preclude Williams Hughes from testifying at trial. Hughes is Ziniti's railroad crossing safety expert, who intends to opine that (1) the Railroad failed to recognize the alleged hazards at the crossing, (2) the crossing should have had additional traffic control devices, and (3) the Railroad failed to erect those additional devices. The Railroad contends that Hughes is unqualified to render opinions on those topics because he does not possess the requisite education,

12

training and experience, testified exclusively for plaintiffs with claims against railroads, has not performed or applied any formulas or engineering analyses, and has not relied on any particular methodology to form his opinions.

Hughes is plainly qualified to offer his intended opinions. Although he does not have an engineering degree, he worked in the railroad industry for 32 years, including ten years as a manager of grade crossing safety for Norfolk Southern Railway. In that position, he worked with governmental authorities on grade crossing safety issues (including engineering issues such as the types of warning devices to install at crossings), evaluated crossing safety deficiencies, and recommended safety improvements. His opinions are based on his knowledge, personal experience, and training over many years in the industry. *See* Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) ("Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. In other cases, the relevant reliability concerns may focus upon personal knowledge or experience. . . . [T]here are many different kinds of experts, and many different kinds of expertise.).

While Hughes did not utilize the FRA's accident prediction formula, there is no indication that is the only method by which to analyze grade crossing safety. Hughes' opinions were based on his training and experience, a personal site inspection, numerous documents related to the subject crash, and railroad industry literature related to crossing safety. The fact that most or all of Hughes' consulting work over ten years has been for plaintiffs has no bearing on his qualifications or the admissibility of his testimony. All of the Railroad's challenges to Hughes go to the weight and credibility of his testimony, and the Railroad may fully explore those issues on cross-examination. *See* USGen New England, Inc. v. Town of Rockingham, 2004 VT 90, ¶ 37, 177 Vt.

193 (to the extent weaknesses are demonstrated in expert's testimony, "it goes to weight, not admissibility"). The Railroad's motion to preclude Hughes (# 60) is denied.

Crossing Designation Dispute (# 57)

The Railroad seeks to preclude evidence of the Slaughterhouse crossing's designation as public vs. private. Ziniti, however, intends to argue that because the crossing was listed as private in the FRA inventory database and on inventory forms, it never received federal funding for traffic control upgrades that it would otherwise have been eligible for if designated as public. The Railroad contends that this evidence is irrelevant because (1) Ziniti has failed to demonstrate that the crossing was in fact not eligible for federal funding, and (2) that such funding was not warranted in any case.

With respect to the crossing designation dispute, the court found the following facts to be undisputed in ruling on the motions for summary judgment:

> The crossing itself is a "public" crossing, although it has been designated as a private crossing on Federal Railroad Administration (FRA) inventory forms since 1970. . . . The list of crossings the Railroad had provided to VTrans in connection with the Track I grant also included the names of both public and private crossings which were chosen to receive traffic control device upgrades. . . . In the Corridor Project Application, VTrans did not identify Slaughterhouse Road as a crossing which would receive any additional devices or upgrades, meaning that the crossbuck sign would remain as the only traffic control device. Thus, neither VTrans nor the FRA required the crossbuck sign to be removed, replaced, changed, or upgraded, or any active warning devices (such as automatic gates or flashing lights) to be erected at the Slaughterhouse Road crossing.

Ruling on Pending Motions at 23, 28 (Jan. 31, 2017).

Trini Brassard testified in deposition that a crossing can be classified as private for FRA inventory purposes, and at the same time be classified as public for purposes of § 130 federal

funding. However, Ron Tofani testified in his deposition that if the crossing was designated as private, it would not have been eligible for federal funding. This represents a disputed fact as to eligibility for federal funds, and is for the jury to decide. The court will not preclude evidence of the crossing designation on that basis.

However, there appears to be no evidence that the crossing would have warranted the expenditure of federal funds for traffic signal upgrades even if it were eligible for such funding. Although William Hughes opines that the crossing warranted additional warning devices, he apparently utilizes a different approach than that used by the FRA to determine funding for crossing upgrades. Before Ziniti can argue that no additional warning devices were installed because of the crossing designation, he must convince the court that there is some evidence that, if eligible, the crossing would have warranted the expenditure of federal funds for traffic signal upgrades under the process for determining whether to spend federal funds on such projects. In the absence of such evidence, the crossing designation is irrelevant for that purpose.

Alternatively, Ziniti argues that the Railroad's internal rules require a stop sign at private crossings, and that the "private" designation is relevant to show that the Railroad violated its own rules. David Baer's deposition testimony acknowledged that if the crossing was reported to the FRA as private, then it would have been "marked" as a private crossing, but refused to say that that would have required a private crossing sign and stop sign to be installed at this particular crossing because it was "basically a public crossing at that time." Ziniti also cites to a private crossing sign and stop sign blueprint from the RailAmerica Engineering Services Standards Reference Manual, which states "Private crossing stop sign to be placed at private road crossing." That suggests that, according to the Railroad's internal rules, stop signs must be placed at all private crossings. Evidence of the crossing designation dispute is admissible for this purpose.

15

Ziniti also contends this evidence is relevant to prove punitive damages because it demonstrates a conscious disregard for public safety. As there is evidence that the Railroad knew about the incorrect designation about a year before Ziniti's crash and did not change it, the court agrees that the designation has some relevance to punitive damages.

<u>Prior Accident Crossing History (# 56)</u>

The Railroad seeks to admit evidence that there were no prior accidents at the Slaughterhouse Road crossing, and that there have been no accidents since Ziniti's accident. Specifically, the evidence is that, according to VTrans's database, there was no reported accident at the crossing from 1992 to the date of Ziniti's accident (November 3, 2011). The Railroad argues that this evidence tends to show that the crossing was and is reasonably safe, and that no further safety measures were necessary.

The Supreme Court has stated that:

> Generally, when the party seeking admission of the evidence can show substantial similarity of conditions, evidence of no prior accidents is admissible to show (1) absence of the defect or condition alleged, (2) the lack of a causal relationship between the injury and the defect or condition charged, (3) the nonexistence of an unduly dangerous situation, or (4) want of knowledge (or of grounds to realize) the danger.

<u>Mobbs v. Cent. Vermont Ry., Inc.</u>, 155 Vt. 210, 226–27 (1990) (citing E. Cleary, McCormick On Evidence § 200, at 591–92 (3d ed. 1984); <u>Wollaston v. Burlington Northern, Inc.</u>, 188 Mont. 192, 202 (1980) (evidence of whether there had been prior accidents at grade crossing was relevant to issue of whether additional protection was required at crossing)) (internal quotations omitted). Furthermore, "when the prior safety record is so extensive that it is sure to include an adequate number of similar situations, the similarity requirement is satisfied." <u>Id</u>. at 227 citing McCormick, <u>supra</u>, at 591); *see also* <u>Erickson v. Walgreen Drug Co.</u>, 120 Utah 31, 40–41 (1951) (error to

exclude evidence that no one had slipped on terrazzo entranceway, regardless of weather conditions, for the fifteen years during which at least 4,000 persons had entered store every day).

The court is inclined to admit this evidence, as it appears to be relevant to whether the crossing was reasonably safe at the time of the accident, whether additional warning devices were required, and whether the crossing's alleged deficiencies caused the collision. It is true that the prior safety record here is somewhat less extensive than in other cases where such evidence has been admitted. The cases cited in Mobbs that have allowed such evidence generally involved instances where thousands of people walked over the accident location each day for years. Even in Mobbs, the proffer apparently was that no accidents had occurred or complaints had been registered "over a span of 17 years, with hundreds of thousands of motorists and cars and thousands of trains under all conceivable conditions including those existing at the time of the accident . . . ." Brief for Appellee at 26, Mobbs, 155 Vt. 210 (1990) (No. 86-255).

The prior accident history the Railroad seeks to admit here includes a period of 25 years. The court recalls evidence in the record that the daily train count is historically four per day, and the motor vehicle traffic count is approximately 10 per day. That adds up to roughly 36,500 train crossings and 91,250 motor vehicle crossings over the quarter-century time-frame. The court believes that is "so extensive that it is sure to include an adequate number of similar situations" in accordance with Mobbs, 155 Vt. at 227, and the authorities cited therein. Ziniti will of course be allowed to present evidence of the infrequency and improbability of a vehicle and train encountering each other at this crossing.

### Prior Crossing "Incident" and News Reports (# 59)

The Railroad seeks to exclude, as unsubstantiated and inadmissible hearsay, evidence of an alleged incident where a snowplow was struck or almost struck by an Amtrak train at the

17

Slaughterhouse Road crossing in 2010, as well as all media coverage of the 2011 collision involving Ziniti. Ziniti contends that evidence is relevant and admissible.

According to Ziniti, a man named Steve Korrow was the driver of a snow plow truck whose plow was struck or almost struck by an Amtrak train at the subject crossing in 2010. Evidence of the prior crossing incident includes email exchanges. One is an email sent on February 2, 2010 from Karen Korrow (apparently Steve's wife) to an individual named "Bill" at the email address catmanl@aol.com. The email discusses a "call from Joe Flynn, Rail Program Chief" regarding the subject crossing. According to Korrow, Flynn was "surprised Amtra[]k hasn't reported as it was his understanding they report all near accidents and accidents." Korrow described the incident with Steve as follows: "Amtra[]k stopped immediately after passing Steve but nobody got out and Steve didn't talk to anyone. Steve did wait about 10 minutes for somebody to get out to talk to but they sat there for about 10 mins and then started up and drove off." Ex. 1 to MPR # 59 (Korrow email).

Another email chain referencing this prior crossing incident started the day of the Ziniti collision, November 3, 2011. That afternoon, an individual named Mickey Eastman emailed Joseph Flynn to report that "[o]nce again a vehicle has been swept down the tracks for about ½ mile at the crossing on Slaughterhouse Drive in Northfield. . . . . Do we have to wait until someone gets killed before a light is put in?" This email was forwarded to other VTrans employees. Trini Brassard, in a bullet point list of proposed responses to Eastman, stated in a subsequent email that "[t]his fellow pulled too far forward about a year and half ago at this crossing and Amtrak hit his snow plow," and that "[d]iscussions with NECR this is the only other incident at this crossing they remember." In a response to that, Flynn stated:

> If memory serves me right, the alleged snow plow strike was never
> verified. Once receiving a call from, the mother I think, I contacted
> Bill Hollister. I also called Mike Lee of Amtrak Police. Mike
> investigated and the train never stopped, nor was the crew aware

18

anything had been struck. According to Mike Lee, the allegation was questionable.

Id.

A newspaper article written by Jim Mossman for The Northfield News and published a week or two after the Ziniti collision, states that "[t]here was apparently another recent incident, a close call which involved a pickup with a snowplow on it." Ex. F to Def.'s MPR # 59. The article, titled "The Road That Nobody Owns and the Recent Collision at the Slaughterhouse Road Railway Crossing," also contains information about the crossing's history, interviews with several people including Trini Brassard, and the author's own experience with and opinions about the crossing.

Ziniti contends that this evidence is relevant, and is either not hearsay or falls under a hearsay exception. He further contends that, even if it is hearsay, he can present the live testimony of Steve Korrow, the alleged snowplow driver, Karen Korrow (Steve's wife), and Jim Mossman, the newspaper article author. The emails, Ziniti asserts, are not hearsay because they are not being offered to prove the truth of the matter asserted, but to prove the Railroad's knowledge of the prior incident. He also asserts that the emails from VTrans are business records pursuant to V.R.E. 803(6), and that Brassard's bullet point list is a present sense impression.

Testimony from Steve Korrow, the driver of the snowplow, about his personal experience traversing the crossing in 2010 is relevant, as it tends to rebut a contention from the Railroad that there were no prior accidents or incidents at the crossing. While the Railroad claims that Korrow was never properly noticed as a witness or deposed, there is no requirement to depose all witnesses before trial, and his testimony is proper rebuttal evidence.[2] Testimony from Karen Karrow is not relevant, as there is no indication that she personally experienced this incident. Trini Brassard's

---

[2] If the Railroad wishes to depose Korrow before trial, it may do so, and the parties shall cooperate in scheduling the deposition. Obviously, the trial will not be rescheduled on account of this deposition.

email is not hearsay if offered to prove the Railroad's knowledge of a prior incident at that crossing, a relevant issue. *See* V.R.E. 801(c). Her email indicates that the Railroad "remember[ed]" the 2010 incident with Amtrak and the snowplow. The Railroad can counter that with evidence that it was unaware of the alleged 2010 incident, and that the incident was unverified, including the response from Joseph Flynn. The 2010 email from Karen Korrow is inadmissible hearsay.

Ziniti asserts the newspaper article is an exception from the general rule that newspaper articles are inadmissible hearsay because it is "relevant, necessary, trustworthy, and its probative value outweighs its prejudicial effect." Pl.'s Opp'n to Defs.' MPR # 59 at 5. Essentially, he argues that the article is admissible pursuant to the "catchall" or "residual" exception as applied in United States v. Sposito, 106 F.3d 1042, 1047–48 (1st Cir. 1997) (1901 newspaper article describing fire in courtroom was admissible pursuant to residual exception to rebut evidence of charcoal and charred timbers found in clock tower debris and argument that clock tower had collapsed due to lightning bolt). However, Vermont has not adopted the residual exception. *See* Reporter's Notes—V.R.E. 803 ("Federal and Uniform Rules 803(24) contain a limited "catchall" exception under which evidence having guarantees of trustworthiness equivalent to those in Rule 803(1)-(23) may in case of necessity be admitted. That provision has not been adopted.").[3] The article itself is hearsay, contains additional layers of hearsay within it, and is inadmissible.

Nonetheless, the article's author Jim Mossman may testify as to his personal knowledge of the crossing, as well as any opinions he has about the crossing, so long as those opinions are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical

---

[3] The residual exception to the hearsay rule found in the Federal Rules of Evidence has since been moved to F.R.E. 807. *See* Advisory Committee Notes—F.R.E. 807.

20

or other specialized knowledge . . . ." V.R.E. 701. Before Mossman testifies, Ziniti's counsel shall specify for the Court exactly what Mossman will testify to, so as to avoid inadmissible hearsay.

### Ziniti's Potential Commission as Active Duty Military Officer (# 45, 61, and 65)

Part of Ziniti's damages claim is for lost earning capacity. If not for the train collision, he argues, he would have commissioned as an active duty officer in the U.S. Army and served for 20 years. Ziniti seeks to preclude evidence that he *would not* have commissioned as an active duty military officer. The Railroad seeks to preclude evidence that Ziniti *would* have commissioned as an officer, as well as Ziniti's military expert Dennis McCarthy. In a related motion, the Railroad also seeks to strike affidavits by Norwich University professors with respect to Ziniti's likelihood to become a commissioned officer.

### Evidence that Ziniti Would Have Commissioned (Gen. McCarthy) (# 65)

Evidence that Ziniti would have commissioned is offered to support his lost earning capacity claim. This court had the opportunity to address lost earning capacity arguments in another recent case. *See* Ruling on Motions in Limine, Brown v. State, No. 473-5-15 Cncv, at 6–12 (Vt. Super. Ct. (Mar. 3, 2017) (Mello, J.). With respect to loss of earning capacity, the Supreme Court has explained:

> Loss of earning capacity is a proper element of damages to the plaintiff. This element of damages, like any other, must be proved, and enough facts must be shown to enable the jury to make an intelligent determination of the extent of his loss. Ordinarily, with an adult, this is to be shown by proof of what the party earned before the injury, and what he has been earning since. But his earnings in one employment are not a suitable basis for determining his earning capacity in another employment at the time of or after the injury.

Trombetta v. Champlain Valley Fruit Co., 117 Vt. 491, 494 (1953) (citations omitted); *see also* Melford v. S. V. Rossi Constr. Co., 131 Vt. 219, 223–24 (1973). A plaintiff is not precluded from

21

seeking damages for lost earning capacity merely because the precise amount is difficult to compute or because he or she has not yet acquired an earning capacity. *See* Brueckner v. Norwich Univ., 169 Vt. 118, 128 (1999). But, like recovery for any type of damages, lost wages and earning capacity must be based on admissible evidence and not on undue speculation. *See* Deldebbio v. Blanchard, No. 2:06-CV-115, 2008 WL 2581080, at *1–2 (D. Vt. June 26, 2008); Schnabel v. Nordic Toyota, Inc., 168 Vt. 354, 363 (1998) (quoting Haynes v. Golub Corp., 166 Vt. 228, 238 (1997)) ("when front pay is allowed, the damages must be 'limited to a reasonable period of time' and must not be 'speculative'").

Other courts have addressed cases where plaintiffs claim damages for loss of earning capacity based on their intention to change occupations (by starting a new occupation or returning to an old one). *See* Annotation, Admissibility, in Personal Injury or Death Action, of Evidence as to Injured Party's Intention to Enter Occupation Other than that Engaged in at Time of Injury or Death, 23 A.L.R.3d 1189 (originally published in 1969). "If the cases are to be reconciled at all, the result must be reached on the basis of the court's view of the likelihood that the plaintiff could enter the new occupation and intended to do so, a conclusion which depends upon the steps that have actually been taken to accomplish the change of occupation." 2 Stein on Personal Injury Damages § 6:15 (3d ed. Oct. 2016 update). As one federal district court has stated, "the test is not the age, preinjury occupation, nor the nature of the proposed profession, but rather the sufficiency of the plaintiff's evidence in showing his skill, likelihood of becoming a member of the profession and availability of work in that area." Hoffman v. Sterling Drug, Inc., 374 F. Supp. 850, 861 (M.D. Pa. 1974).

The closest Vermont case on point is Melford v. S. V. Rossi Constr. Co., 131 Vt. 219, 223–24 (1973). The plaintiff there was a professional musician, who had studied music in college and

22

had about ten years of experience in the field. He suffered a traumatic brain injury from an accident, which caused him to lose his sense of rhythm. At trial, he was permitted to testify about his intention to pursue a career as a studio musician as evidence of his lost future earning capacity, and to base his estimated future loss of earnings on what studio musicians earn. *See also* Deldebbio v. Blanchard, No. 2:06-CV-115, 2008 WL 2581080, at *1–2 (D. Vt. June 26, 2008) (permitting plaintiff to testify about his pre-accident career goals and ambitions to obtain a master's degree in computer science and become a software engineer, steps taken to fulfill those goals, and delays experienced due to his injuries).

With respect to this case, a pertinent provision of the United States Code provides:

> The Secretary of the Army shall ensure that a graduate of a senior military college who desires to serve as a commissioned officer on active duty upon graduation from the college, who is medically and physically qualified for active duty, and who is recommended for such duty by the professor of military science at the college, shall be assigned to active duty.

10 U.S.C. § 2111a(e)(1).[4] Despite that federal statute, the Railroad contends that to argue that Ziniti would have been commissioned as an Army officer and then spent 20 years on active duty is impermissibly speculative. The Railroad asserts there are too many variables in play affecting that determination. It claims there are no documents or records indicating that Ziniti passed the requirements for commission, or had actually been commissioned or offered commission. It further argues that:

- Ziniti submitted multiple applications for Reserve or National Guard duty, but not active duty;
- the Army's hiring needs at that time were decreasing because it was downsizing;
- the likelihood of a 20-year Army officer career cannot be predicted with certainty,
- an Army career could end at any time;
- according to a 2010 West Point study, the Army has poor officer retention rates;

---

[4] Norwich University is a senior military college. 10 U.S.C. § 2111a(f). It is undisputed that Ziniti was recommended to serve as an Army officer by the professor of military science at Norwich, and in fact graduated from Norwich in 2013.

- Ziniti was clearly medically disqualified due to his ADHD and a learning disability; and
- Ziniti withheld information about his ADHD and learning disability from the Army and ROTC.

In short, virtually all of the arguments posed by the Railroad go to the weight of the evidence, rather than its admissibility. Ziniti's argument that he would have been commissioned as an Army officer and spent 20 years on active duty is not unduly speculative. Ziniti's military expert, Lt. Gen. Dennis McCarthy, opines that based on his review of the records, Ziniti's participation in Army ROTC and the "Simultaneous Membership Program," and on Ziniti's stated intention, Ziniti would have commissioned as an Army officer upon graduation from Norwich University and served 20 years on active duty. While the Railroad undoubtedly has numerous options by which to impeach this testimony, that does not make it inadmissible. While it is true that an Army career can end at any time due to any number of unforeseen circumstances, the same can be said about any career or anything in life. The 2010 West Point study indicating poor officer retention rates could go both ways: it might suggest that a 20-year officer career is unlikely, or it might suggest that, because the Army has trouble retaining officers, someone who wants to be an officer for 20 years has a good chance of doing so due to lack of competition. Whether the Army's hiring needs in 2012 would have affected Ziniti's chances of commission or subsequent promotion is a factual question for the jury.

That Ziniti submitted multiple applications for Reserve or National Guard duty, but not active duty, also does not make McCarthy's opinion inadmissible. McCarthy noted Ziniti's participation and progress in ROTC and opined that, after ROTC is "obviously" commission in the Army. He submitted Reserve and National Guard applications after the accident, and after he had been disenrolled from ROTC. But his post-accident applications have little bearing on what he would have done had the accident never happened. Most importantly, Ziniti has stated that his

24

intention was to commission as an active duty Army officer, and took steps to do that pre-accident, including attending Norwich University (a "senior military college") and participating in ROTC. He is not attempting to "urge the jury to peg [his] earning capacity to the salary of a world-class athlete, neuroscientist, or best-selling author just by testifying that is what [he] wanted to do." Licudine v. Cedars–Sinai Med. Ctr., 3 Cal. App. 5th 881, 894 (2016). Moreover, McCarthy's testimony further indicates that the greatest number of Army officers serve in the "active" component, as opposed to the Reserves or the Guard, and that even some officers in the Reserves and Guard are full-time.

The Railroad's most substantial argument is that Ziniti would not have commissioned because he was medically disqualified due to ADHD and a learning disability, and because he failed to disclose his learning disability to the Army or ROTC. The Railroad relies on the following Army regulation:

> **2–27.**
> **Learning, psychiatric and behavioral disorders**
> a. Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder (314), or Perceptual/Learning Disorder(s) (315) does not meet the standard, *unless applicant can demonstrate passing academic performance and there has been no use of medication(s) in the previous 12 months*.
> b. Current or history of academic skills or perceptual defects (315) secondary to organic or functional mental disorders, including, but not limited to dyslexia, that interfere with school or employment, do not meet the standard. *Applicants demonstrating passing academic and employment performance without utilization or recommendation of academic and/or work accommodations at any time in the previous 12 months may be qualified*.

Army Reg. 40-501, ¶ 2–27 (emphasis added). There is no dispute that Ziniti was diagnosed with ADHD in grade school and again in 2007, and a learning disability in 2007. Those diagnoses generally disqualify an Army candidate from meeting the required medical standard. However, as

25

the italicized portions in the above regulation clearly indicate, a candidate with those diagnoses may still be qualified if certain conditions are met.

While Ziniti's academic performance at Norwich was initially poor, his grades significantly improved prior to the accident, he made Dean's List for two semesters, and he graduated in 2013. He had stopped taking ADHD medication years prior. And, while he had an "Educational Profile" in effect throughout his tenure at Norwich indicating that he was entitled to certain academic accommodations if he requested them, evidence suggests that he last used academic accommodations in April 2011. Indeed, his improved academic performance indicates that those accommodations were no longer necessary.[5] An Army document suggests that the reason he was eventually denied a commission in 2013 was because of medication he was required to take due to a condition resulting from the crash. *See* Ex. 7 to MPR # 65. The evidence suggests that Ziniti might still have qualified for commission despite his ADHD and learning disability diagnoses.

The Railroad also contends that Ziniti was less than forthcoming about his learning disability diagnosis with respect to Norwich University's Department of Military Science, the Army, and the ROTC. It appears that Ziniti did not disclose his learning disability diagnosis on several commission application forms. However, Major Paul Stafford, an Assistant Professor of Military Science at Norwich who recruited Ziniti to become a cadet in the Army ROTC, states he was "aware that [Ziniti] had once been diagnosed as having ADHD and a related learning disability," and that he "believe[s] [Ziniti] was candid and forthcoming in his answers to physical examination questions about his physical and mental health history." Ex. 3 to Pl.'s Opp'n to MPR # 65 (Stafford Aff.) ¶ 7. Whether Ziniti was candid in disclosing his potentially disqualifying

---

[5] Any post-accident testing accommodations as a result of injuries sustained in the crash are, of course, entirely irrelevant to whether he would have commissioned as an Army officer but for the accident.

mental health diagnoses, and whether that would affect his likelihood to commission as an Army officer, are matters of weight and credibility for the jury to decide.

Next, the Railroad challenges the reliability of General McCarthy as an expert witness, and requests a Daubert hearing. It asserts that McCarthy is not qualified to opine on regular Army commission standards, and specifically whether Ziniti was medically qualified to receive a commission. It further claims that McCarthy's opinions are not based on sufficient facts, reliable principles or methodology, or any principles reliably applied to the facts.

McCarthy served two years in the Army ROTC in college, and was commissioned in the Marine Corps in 1967. Subsequently, he spent time in Vietman, went to law school, and served in the Marine Judge Advocate Corps for two and a half years, including time as a prosecutor, defense counsel, and military judge. He served active duty in the Marines until 1978, when he accepted a reserve commission and entered private practice as a lawyer. From 2005 to 2009, McCarthy was the Executive Director of the Reserve Officer's Association, whose mission is to advise Congress and the American people on the defense needs of the United States. By the end of his military career, McCarthy had earned the rank of Lieutenant General. From 2009 to 2011, McCarthy served as Assistant Secretary of Defense for Reserve Affairs.

Although it was apparently never his primary responsibility, McCarthy testified that he has been in charge of some Army personnel matters. As Assistant Secretary of Defense, he had "substantial policy development responsibility" for all five branches of the Armed Forces, had occasions to "advise the Secretary on the employment of active duty Armed forces," and "worked closely" with "quite a number of active duty regular Army soldiers" who worked under him. Pl.'s Ex. 6 (McCarthy depo.) at 17:5–22. He also testified that he "implemented Army policy quite frequently with regard to fitness reports . . . dealing with regular Army soldiers" and had some

familiarity with the Army's standards to evaluate his own subordinates who were in the regular Army. Id. at 19:15–20:10.

As to McCarthy's opinion, the following exchange occurred at deposition:

> Q. Do you believe you're qualified to give an opinion as to whether or not a candidate such as Mr. Ziniti is qualified to receive a commission in the United States Army?
>
> A. I believe I am qualified to interpret the military records and the military regulations and to render an opinion on that, yes.

Id. at 233:6–12. More specifically, it appears his opinion was based on the "Army's opinion that [Ziniti] was qualified," and his opinion was that Ziniti "appeared to be progressing satisfactorily in the ROTC program. There is no indication that he would not complete the ROTC program. And, therefore, I was prepared to conclude that he would get a commission." Id. at 234:21–235:5. McCarthy clarified that his opinion was based on his review of how Ziniti performed in ROTC, what Ziniti told him, and his interpretation of the Army records. Id. at 235:6–12. While McCarthy admitted there are no Army records explicitly stating that Ziniti was qualified, he observed that the Army made a record of disenrolling him after the accident, that there was no record of disenrolling him before then, and that he thought it was "fair to assume" from that that Ziniti "was actively progressing and satisfactorily meeting their requirements." Id. at 236:13–19.

The Railroad specifically challenges McCarthy based on his concession that he is not qualified to opine whether the specific academic accommodations available to Ziniti would have disqualified Ziniti under an Army regulation. McCarthy stated that an Army medical officer would be the best person to make those decisions. However, his concession that he is not qualified to render an opinion on that specific issue does not make his opinions and testimony inadmissible. His opinion is that, based on his review of the records and Ziniti's performance in ROTC, the Army had decided to commission him. He is qualified to offer that opinion based on his experience.

He is also qualified to opine that Ziniti likely would have been promoted and served a 20-year career as an officer, and as to the compensation Ziniti would have received in that career. The Railroad will have ample opportunity to attack McCarthy's credibility and the weight of his opinion through cross-examination. The court denies the Railroad's motion to preclude (1) evidence that Ziniti would have commissioned as an Army officer and (2) General McCarthy (# 65). A Daubert hearing is unnecessary.

Evidence that Ziniti Would Not have Commissioned (Gen. Bromberg) (# 45)

Ziniti seeks to exclude evidence that he would not have commissioned as an active duty military officer, specifically through the Railroad's military expert General Howard Bromberg (# 45). General Bromberg opines that Ziniti would *not* have commissioned because of ADHD and a learning disability. Under the applicable regulation, it appears the Army has some degree of discretion in qualifying candidates who have a history of those diagnoses if the candidates no longer take medication and have recently made satisfactory academic progress without accommodations. To the extent there is an element of discretion there, Bromberg can certainly testify that the Army would have exercised its discretion *not* to commission Ziniti due to disqualifying medical factors. Ziniti's motion to exclude evidence that he would not have commissioned (# 45) is denied.

Norwich University Military Affidavits (Schneider, Smith, and Stafford) (# 61)

The Railroad also seeks to strike affidavits of three Norwich University military officials, and to exclude their opinion testimony (# 61). In support of his motion in limine to exclude evidence that he would not have commissioned as an Army officer, Ziniti offered affidavits from Rear Admiral Richard Schneider, PhD (President of Norwich University), Colonel Stephen Smith (Professor of Military Science at Norwich), and Major Paul Stafford (Assistant Professor of

29

Military Science at Norwich). Those affidavits generally state that his academic grades and physical fitness improved dramatically throughout his tenure at Norwich, and that he would have been a successful officer. Specifically, Major Stafford states that he was aware of Ziniti's ADHD and learning ability, and Ziniti was candid and forthcoming in his answers to questions about his physical and mental health history, that he did not use or need testing accommodations in his ROTC classes, that the accommodations he used did not disqualify him from commissioning, and that he "had the mental ability to serve successfully as an Army officer" and to "be promoted within his peer group." Major Stafford further states that Ziniti expressed an intention and desire to serve on active duty, and that in October 2011 he was on track to be commissioned in 2012 if he graduated and passed physical requirements.

The Railroad contends that those affidavits represent improper expert opinions that were not disclosed in accordance with Rule 26, and that it had no opportunity to depose those witnesses. Rule 26(b)(4), however, which permits discovery of experts, "applies only to 'facts known and opinions held' that were 'acquired or developed in anticipation of litigation or for trial.'" Reporter's Notes—V.R.C.P. 26. Accordingly, "[a]n expert whose knowledge or opinions are relevant because of his participation in the events giving rise to suit should be treated for discovery purposes as an ordinary witness."

The knowledge and opinions of Admiral Schneider, Col. Smith, and Maj. Stafford are relevant because of their participation in the events giving rise to the suit. They all knew Ziniti before the lawsuit and even before the 2011 accident. The "facts known and opinions held" by them were not "acquired or developed in anticipation of litigation or for trial." Rather, their opinions and knowledge of relevant facts are based on interactions with Ziniti and their work at Norwich University. Nor were they ever treated as expert witnesses. Thus, they should be treated

30

for discovery purposes as ordinary witnesses, and Rule 26(b)(4) does not apply. While the Railroad claims they were denied the opportunity to depose these three witnesses, there was nothing preventing the Railroad from contacting those witnesses or deposing them during discovery. All three were clearly identified as fact witnesses early on in the process. Indeed, in an interrogatory response, the Railroad itself even identified Col. Smith and Maj. Stafford as "potential witnesses" that it "may call to testify at trial[.]" Ex. 8 to MPR # 61. The Railroad's motion to strike these affidavits and preclude opinion testimony from these witnesses (# 61) is denied. Any challenge to their factual knowledge or opinions can be explored at trial through cross-examination.

### Ziniti's Social Media Postings and Comments (# 43 and 64)

Ziniti seeks to exclude evidence of what he calls "irrelevant and prejudicial" postings and comments that he and others made on social media. (#43). The Railroad seeks to admit those postings and comments, as well as content on certain other Internet websites. (#64).

The Internet evidence falls into several broad categories. The Facebook posts by Ziniti involving political and social commentary include a couple of derogatory posts about former President Barack Obama, a post critical of Massachusetts Senator Elizabeth Warren, a post supporting Ted Nugent and telling the "liberal media" to "fuck off," a post calling someone "gay," and a post consisting of a nonsensical collection of swears and other derogatory words posted in what appears to be a Facebook "group" titled "aww fuck it, i love to swear." The majority of these were apparently made between 2007, when Ziniti was still in high school, and 2009, more than two years before the crash and before he would have commissioned. The Railroad argues that these posts suggest that Ziniti is racist, homophobic, prejudicial towards women, and critical of his potential commander-in-chief, and therefore go toward his character and fitness to be

31

commissioned and serve successfully as a military officer. The Railroad also contends they might explain his inability to obtain gainful employment.

The 2012 posts about Elizabeth Warren and Ted Nugent appear to be relatively innocuous statements of Ziniti's political views, and are irrelevant. The two posts from 2007 when Ziniti was still in high school are simply too remote to be of probative value, and any minimal probative value they might have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* V.R.E. 403. While the postings from 2008 and 2009 about President Obama would appear to reflect on Ziniti's character to serve in the military, as they were made after he began his tenure at Norwich University, there is simply no evidence that the Army would have discovered these in the vetting process. The court will leave open the possibility that those specific posts may be admissible, provided that the Railroad can authenticate them and produce some evidence that they would have been discovered by the Army during the vetting process. The notion that any of the political posts discussed above might explain Ziniti's inability to obtain gainful employment is purely speculative.

Another post consists of Ziniti's "friend's" comment suggesting that Ziniti was listening to the Metallica song "Creeping Death" when he was hit by the train. The Railroad apparently wants to use that comment to insinuate that Ziniti was listening to loud heavy metal music shortly before the crash. The Railroad can ask Ziniti if he normally listens to loud music, and if he remembers listening to loud music just before the crash. But the "friend's" Facebook comment is totally irrelevant hearsay and will be precluded.

Next is a series of posts, comments, and photos by Ziniti and others joking about or making light of the crash. The Railroad claims these go to his damages, in that they rebut the idea he suffered emotional harm from the crash. Any comments by people other than Ziniti are hearsay

32

and completely irrelevant. The posts and comments by Ziniti may be of limited probative value, as they would tend to rebut his emotional damages claim, and are not unduly prejudicial. The same can be said for the picture of Ziniti reading a train magazine. The court will allow posts and comments by Ziniti where he appears to be joking about or making light of the crash, provided the Railroad can authenticate those posts and comments. Similarly, the court will allow the photograph of Ziniti reading a train magazine, so long as a witness authenticates the photograph.

Next, there are Facebook posts about Ziniti's recovery and social activities in the months and years following the crash. Again, any comments posted by people other than Ziniti are hearsay. The Railroad can call those people to testify about their knowledge of Ziniti's recovery and social activities following the crash. A limited number of Ziniti's posts on this topic may be relevant and admissible, provided they are authenticated. Additionally, the photographs of Ziniti participating in marathons are also relevant and may be admissible, provided a witness can authenticate the photographs.

The Railroad also wants to use portions of Ziniti's LinkedIn profile, namely a comment by a fellow Norwich student praising Ziniti's work on the Corps Honor Committee in his senior year at Norwich, and the fact that others have "endorsed" him as having certain skills. The Railroad contends these rebut the argument that Ziniti lacks vocational skills due to the crash. This is all hearsay. The Railroad can call the people who made that comment and those endorsements, and examine them on their knowledge of Ziniti's vocational skills.

A testimonial on Norwich University's Career and Internship Center webpage reads:

> *"The Career Center helped me update my resume each year and coached me on proper interview technique, which allowed me to be prepared for any question an employer may ask!"*– **Matt Ziniti, Business Management '13 (Corps)**

33

The testimonial is placed next to what is apparently a photograph of Ziniti. As this appears to be a statement by Ziniti, it is relevant because it goes to his vocational skills. It is admissible so long as the Railroad can authenticate it.

Finally, the Railroad seeks to admit evidence from two wedding websites involving weddings that Ziniti apparently attended in 2016 and 2017, years after the crash. One of these websites includes a description of Ziniti, written by an unidentified person, that Ziniti has a "love/hate relationship with trains." The Railroad can ask Ziniti if he attended weddings post-accident, and if he has a love/hate relationship with trains. But anything from the wedding websites is hearsay, has no probative value, and will be excluded.

The court has stated that some of the Internet posts, comments, and photographs discussed above may be admissible. However, before trial, the Railroad's counsel shall show the court and Ziniti's counsel exactly which posts, comments, and photographs it intends to introduce in accordance with the court's ruling here. That will allow both parties and the court to resolve any last-minute issues regarding that evidence.

Regarding authentication, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. V.R.E. 901. Other courts have treated authentication of social media evidence no differently than other writings. *See*, *e.g.*, State v. Hannah, 448 N.J. Super. 78, 90–91 (App. Div. 2016) (applying traditional rules of authentication to social media postings); Sublet v. State, 442 Md. 632 (2015); United States v. Vayner, 769 F.3d 125, 131–33 (2d Cir. 2014); People v. Valdez, 201 Cal. App. 4th 1429, 1435 (2011); Tienda v. State, 358 S.W.3d 633, 642–47 (Tex. Crim. App. 2012); *cf*. State v. Lawrence, 2013 VT 55, ¶¶ 9–14, 194 Vt. 315 (affirming trial court's denial of defendant's motion for new trial where "evidence

of a post on the complainant's unsecure MySpace page offer[ed] only speculation as to authorship" because "an adverse witness in the case had access to complainant's MySpace page for the purpose of posting messages, and . . . post itself did not include information that tended to show that complainant, as opposed to the friend, was the author").

Direct proof of authentication, such as Ziniti admitting that he authored the posts, is not required. Hannah, 448 N.J. Super. at 90. Authentication may be established by circumstantial evidence, such as distinctive characteristics or intimate knowledge known only to that person. Id.; Valdez, 201 Cal. App. 4th at 1435 ("The author's testimony is not required to authenticate a document; instead, its authenticity may be established by the contents of the writing or by other means") (citations omitted). "As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility." Valdez, 201 Cal. App. 4th at 1435.

The court cannot make a definite ruling on authentication right now, because "[e]vidence may be authenticated in many ways, and as with any piece of evidence whose authenticity is in question, the 'type and quantum' of evidence necessary to authenticate a web page will always depend on context." Vayner, 769 F.3d at 133. However, the court will adhere to the general rules of authentication, as expressed above, in determining whether Ziniti's social media posts and comments can be authenticated. At trial, the Railroad must produce evidence sufficient to support a finding that the posts and comments are what it claims they are.

Permanent Cognitive Deficiencies (# 62)

The Railroad next seeks to exclude any evidence that Ziniti suffers permanent cognitive deficiencies as a result of the accident. Specifically, the Railroad argues that there is no expert

medical testimony that Ziniti has permanent cognitive defects as a result of the accident rather than his preexisting ADHD. At the same time, the Railroad moves to exclude testimony by Ziniti's expert neurologist, Dr. Randall Benson, as unreliable under Daubert and Rule 702.

The Railroad points to an August 20, 2013 letter written by Ziniti's treating neuropsychologist, Dr. Otto, in support of Ziniti's Army officer candidacy, stating: "Based on my most recent evaluation and reports of functioning, [Ziniti] does not demonstrate any clear decline in cognitive functioning from his baseline prior to his injury." Ex. A to MPR # 62. Dr. Otto examined Ziniti again in 2015 and subsequently opined that, although Ziniti "appeared to return to baseline in some areas," there were "some residual cognitive impairments that were evident." Otto dep. at 37:11–13, 66:21–24. He indicated that the areas where Ziniti did not return to "baseline" were the same areas of functioning that could have been affected by his ADHD. Id. at 66:25–67:19. The residual impairments described by Dr. Otto include difficulties in working memory on some tasks, higher-level attention, word retrieval, recall of new visual information, reasoning and cognitive flexibility, mild impulsivity, anxiety, and irritability. Id. at 34:14–38:8. Dr. Otto's testimony does not clearly link those residual defects to the accident. He testified that he could not opine to a reasonable degree of medical certainty that Ziniti has cognitive defects that were related to the accident. Id. at 75–77. He stated that those defects could have been related to the pre-existing ADHD, and that he couldn't rule out the accident as a contributing cause. Id.

Dr. Katz, Ziniti's treating neurologist, testified that in his most recent examination of Ziniti on May 5, 2015, Ziniti presented with difficulty managing at work, ongoing problems with job choices, and emotional changes such as getting angry easily and frequently. Dr. Katz recommended vocational rehabilitation counseling. Dr. Katz opined that those issues were

36

consistent with a brain injury like Ziniti's. Katz dep. at 42:16–21. When asked what his prognosis for Ziniti would be "related to his brain injury," Dr. Katz responded:

> Mr. Ziniti had a severe brain injury. He went through the stages of recovery that we discussed earlier and recovered to a reasonably high level of functioning in the community, but still has some residual problems in attention, cognitive and emotional regulation that I think were demonstrated when he tried to get back into activities and in interpersonal activities, and I think those kinds of problems will be possibly persistent and challenging for him, and he'll need to manage those for the foreseeable future.

Id. at 43:6–19. When asked how those issues relate to Ziniti's ADHD, Dr. Katz stated that "in people who have ADHD and have a traumatic brain injury, the problems before the injury interact with the problems that are a result of the injury to the brain." Id. at 44:7–10. Dr. Katz further opined that this is consistent with Ziniti's prognosis. Id. at 44:11–16. Finally, Dr. Katz also stated that all of the treatment provided to Ziniti in the time period since the train collision was reasonable and necessary due to the injuries sustained in the collision. Id. at 46:4–11.

At the deposition, Dr. Katz was asked to review Dr. Otto's deposition transcript. When asked whether he agreed with an opinion by Dr. Otto that there was "no residual problem related to the motor vehicle accident," Dr. Katz stated that he disagreed. Id. at 68:2–9. He explained that the basis for his disagreement was the complaints presented by Ziniti during the May 2015 visit, as well as his knowledge of the extent of the brain injury, the severity of the brain injury, and the fact that failure in functioning as well as thought and emotional regulation can manifest in different ways as patients are challenged in different ways. Id. at 68:10–69:9, 72:25–73:6.

Dr. Freiberger, Ziniti's pediatrician who treated him once post-accident, also opines that, based on his review of the 2012 Otto and Katz evaluations:

> [I]t was clear from tracking through their evaluations that they believed that there were traumatic events and I believe there were traumatic events that . . . created neurologic problems that were far

in excess of his typical ADD, especially since at that point in time he was a high-functioning ADD what [sic] was unmedicated.

Freiberger dep. at 34:19–35:2. He later reiterated that Ziniti may be suffering from cognitive defects after his accident which were different than what he had before. Id. at 74:9–14.

The testimony by Dr. Otto, Dr. Katz, and Dr. Freiberger, taken together, constitutes sufficient expert evidence that Ziniti suffers from permanent cognitive defects resulting from the train collision. While some of it might be contradictory, that is a matter of credibility for the jury to weigh, and does not make the evidence inadmissible. All of the Railroad's complaints about this evidence merely represent weaknesses that it can exploit on cross-examination.

The Railroad also specifically seeks to exclude Dr. Freiberger's opinion on Ziniti's current neurologic problems, and that the accident increased Ziniti's risk of developing future brain disorders, such as dementia. These arguments, again, go to the weight of the evidence rather than its admissibility. Dr. Freiberger is surely qualified to opine whether a patient currently suffers neurologic problems based on his review of a neurologist's evaluation. He can also testify about Ziniti's risk of developing future brain disorders, and the Railroad can cross-examine him about the basis for that opinion.

Dr. Randall Benson, Ziniti's Expert Neurologist (# 63)

Ziniti's expert neurologist, Dr. Benson, opines that "Ziniti sustained a severe traumatic brain injury as a result of his injury on November 3, 2011," and that he "continues to experience symptoms directly caused by his injury." Benson report at 21. Dr. Benson's opinion is based on "ten lines of evidence," including "biomechanical and acute injury findings, clinical symptoms, neurobehavioral findings, speech language pathology findings, ENT findings,

neuroophthalmology findings, neuropsychological findings, brain imaging, and neuroendocrine findings." Id. Dr. Benson also opines in his report:

> While Mr. Ziniti is learning disabled according to testing done by a PhD psychologist at Norwich U. prior to his injury, his GPA in both high school and college was 2.7, which indicates the ability to learn and achieve. His developmental learning disabilities would predict a poorer outcome from a severe TBI.

Id. at 25. Dr. Benson's opinions constitute further expert evidence supporting Ziniti's damages argument that he suffers permanent cognitive deficits due to the accident.

The Railroad seeks to exclude Dr. Benson's opinions and testimony because he utilized Diffusion Tensor Imaging (DTI). DTI is an MRI variation that was developed in 1996, and purports to visualize damage to the white matter of the brain by identifying water flow abnormalities. It is still considered an emerging technology. It uses radio and magnetic pulses to track the movement of water molecules in the brain, resulting in a fabricated image of data points and axons created by analyzing a variety of images, manipulations, and the direction of water diffusion.

The Railroad does not appear to challenge DTI in general. Indeed, such a challenge would almost certainly fail, as several courts have recognized that DTI is reliable, used at multiple facilities, and accepted within the medical community as a method to detect TBI. *See*, *e.g.*, Andrew v. Patterson Motor Freight, Inc., No. 6:13CV814, 2014 WL 5449732, at \*8 (W.D. La. Oct. 23, 2014); White v. Deere & Co., No. 13-CV-02173-PAB-NYW, 2016 WL 462960, at \*2 (D. Colo. Feb. 8, 2016) (holding that Dr. Benson's use of DTI was reliable). Additionally, there are many scholarly articles and validation studies concerning DTI published in peer-reviewed journals. *See* Ruppel v. Kucanin, No. 3:08 CV 591, 2011 WL 2470621, at \*7 (N.D. Ind. June 20, 2011) (noting

that, as of early 2010, were 3,472 papers on DTI published in peer review journals, 83 of which involved DTI in relation to TBI, and 35 of which used a control group for a statistical analysis).

Instead, the Railroad challenges Dr. Benson's method of analyzing the brain imaging data. It contends that he applied a "specialized" and proprietary "data processing algorithm" to create a composite illustration, and that he is the one and only physician who utilizes this method. It also complains that Dr. Benson has refused to disclose the methodology for his algorithm because it is proprietary information for which he has acquired a patent, and that he has refused to disclose the brain images and related data used in his control group. The Railroad further questions the standard deviations Dr. Benson uses for detecting images in the brain, and asserts that he failed to consider the opinion expressed in Dr. Otto's 2013 letter that Ziniti returned to his pre-accident cognitive levels and baseline.

As to the standard deviations and information that Dr. Benson considered in formulating his opinion, those go to the weight of his testimony rather than admissibility. His opinion is unquestionably based on sufficient facts and data to be reliable under Rule 702 and Daubert. He also explained in his deposition why he uses the thresholds or standard deviations he does for detecting brain injuries, and that would appear to be a matter for cross-examination. However, the court has serious concerns about this apparent proprietary "data processing algorithm" that Dr. Benson has not shared with defense counsel, as well as the nondisclosure of data regarding the brain images used in his control group. Additionally, to the extent the standard deviations are reliant on this mysterious algorithm, that is also problematic. In his opposition, Ziniti touts the reliability of DTI in general, but addresses the Railroad's specific challenges only cursorily by asserting it is "simply untrue" that Dr. Benson's process is unique to him, and that all the Railroad's other criticisms go to weight rather than admissibility. Pl.'s Opp'n to Defs.' MPR # 63 at 9–10.

It would be grossly unfair to the Railroad for Dr. Benson to discuss his DTI findings to the jury with no opportunity to fully test his analysis. It is unclear why the proprietary data and information was not disclosed pursuant to a protective order. There may be ways to test Dr. Benson's methodology or determine its reliability without disclosing the secret material; if so, Ziniti has not provided any. Because the court has no basis at this point for assessing the reliability of Dr. Benson's secret methodology under Daubert and Rule 702, the court has no basis for thinking it might be admissible. Dr. Benson's DTI findings are excluded.

The exclusion of Dr. Benson's DTI findings, however, is not grounds to exclude his entire testimony or opinions. Neuroimaging is only one of the ten "lines of evidence" that support his opinions, and DTI is only one part of his neuroimaging findings, as he also utilized CT scans, MRIs, and other types of advanced MRIs. The court rules only that, without any current basis to assess the reliability of Dr. Benson's proprietary algorithm, and absent any concerted effort to argue otherwise by Ziniti, Dr. Benson may not present or discuss his DTI findings to the jury.

Vocational Limitations and Lost Earning Capacity (# 58)

The Railroad contends that Ziniti should be precluded from introducing evidence or arguing that he has vocational limitations and lost earning capacity (distinct from the military career argument) as a result of the train crash. This contention is based primarily on its assertion that Ziniti lacks expert medical evidence that he suffers permanent cognitive defects, an assertion which the court has rejected. The Railroad's other challenges to the opinions of Ziniti's vocational rehabilitation expert, Fran Plaisted, go to the weight and credibility of her testimony, rather than its admissibility. For instance, the Railroad complains that Ziniti is being duplicitous by previously portraying himself to the Army as being fully recovered and free of any cognitive defects, while

41

now portraying himself as having permanent cognitive defects which prevent him from securing and maintaining skilled employment. Again, however, that does not affect the admissibility of Ziniti's vocational limitations and lost earning capacity evidence and arguments.

Order

The court issues the following rulings with respect to the motions in limine, in accordance with the reasoning articulated in the above decision:[6]

Plaintiffs's First Combined Motion in Limine to Exclude Evidence (#44):
1. FRA/Vermont Accident Prediction Formulas: Excluded.
2. Plaintiff's ADD/ADHD: Excluded for the purpose of arguing that Ziniti's ADHD contributed to causing the accident.
3. Prior Accident History at Crossing: Addressed elsewhere in decision.
4. Railroad Grade Crossing Accidents Generally Caused by Motorists: Excluded.
5. Hughes' "Audit" of Contract with Mississippi Department of Transportation: No ruling.
6. "The Rustic," a Bar Ziniti Lived Above: Allowed for a limited purpose as discussed above.
7. Ziniti Never Filed a Tax Return: Excluded.
8. Railroad "Crossbuck" Sign Hanging in Ziniti's Apartment: Allowed.
9. Any Comment/Suggestion/Argument that Drivers Should Stop, Look, and Listen: Allowed.
10. Duty to stop if driver has not heard/seen train or any sign/signal requiring stop: See above.
11. Plaintiff should stop closer than 15 feet to look for a train that he has not previously seen or heard: Allowed.
12. Paraphrasing Legal Duties: See above.
13. Analogies between railroad-highway grade crossings and roadway intersections: Allowed.
14. Braintree "Braking Reaction Time": Allowed.
15. Speculating that Ziniti was on Cell Phone/Playing with IPod at Time of Accident: Excluded.
16. Comment/Insinuation re: Suicide: Excluded.
17. Signs at the crossing were adequate or were "warning signs of choice": Allowed.

Plaintiff's Railroad Crossing Expert Williams Hughes (# 60): Allowed.

Crossing Designation Dispute (# 57): Allowed for limited purposes.

Prior Accident Crossing History (# 56): Allowed.

Prior Crossing "Incident" and News Reports (# 59): Certain evidence allowed. See above.

---

[6] The court clarifies that, as used below, the terms "excluded" and "allowed" refer to whether the evidence described will be excluded or allowed at trial, not to whether the pertinent motion to exclude or admit is granted or denied.

Evidence that Ziniti Would Have Commissioned (Gen. McCarthy) (# 65): Allowed.

Evidence that Ziniti Would Not have Commissioned (Gen. Bromberg) (# 45): Allowed.

Norwich University Military Affidavits (Schneider, Smith, and Stafford) (# 61): Allowed.

Ziniti's Social Media Postings and Comments (# 43 and 64): Certain evidence will be allowed, if authenticated. See above.

Permanent Cognitive Deficiencies (# 62): Allowed.

Dr. Randall Benson, Ziniti's Expert Neurologist (# 63): Allowed, except for any evidence re: DTI findings, which will be excluded.

Vocational Limitations and Lost Earning Capacity (# 58): Allowed.

These are provisional rulings, and the court reserves the right to modify them before or during trial depending on the evidence actually presented. As the court previously ordered, any proposed jury instructions shall be filed by the date of jury draw, January 4, 2018.

SO ORDERED this 3rd day of November, 2017.

_____
Robert A. Mello
Superior Court Judge